Appeal of WILLIAM ZIEGLER, Jr.    Docket No. 123.

> A payment made by a taxpayer to secure to himself the management of a trust estate, of which he was sole beneficiary, during the balance of the life of the trust is not deductible as an expense in the year of its payment but should be written off and deducted ratably over the period of the control so secured.
>
> The par value of the entire stock of a corporation issued in exchange for property is not evidence of the value of the stock nor of the value of the property. In the absence of any evidence, real property consisting of land and buildings can not be presumed to have appreciated to an extent exactly offsetting the normal depreciation of the buildings.

Submitted October 28, 1924; decided December 18, 1924.

*Warren W. Cunningham, Esq.*, and *Luther F. Speer, Esq.*, for the taxpayer.

*A. H. Fast, Esq.* (Nelson T. Hartson, Solicitor of Internal Revenue) for the Commissioner.

Before IVINS, KORNER, and MARQUETTE.

### FINDINGS OF FACT.

I. The Commissioner's determination, appealed from, was mailed to the taxpayer on July 9, 1924. The petition herein was filed on September 5, 1924. The deficiency proposed by the Commissioner to be assessed is with respect to the taxpayer's individual income tax (normal and surtax) for the calendar year 1919 and exceeds $10,000.

II. In computing and determining the deficiency in tax in controversy on this appeal the Commissioner, over the taxpayer's protest:

1. Disallowed as deductions from the taxpayer's 1919 gross income the sum of $150,000 paid by the taxpayer to one William S. Champ and the sum of $50,000 paid by the taxpayer to one E. Ma-

tilda Ziegler, both during the calendar year 1919. These deductions were claimed by the taxpayer on his original return for the calendar year 1919.

2. Added to and included in the taxpayer's gross income for the calendar year 1919 the sum of $228,650.77 as a profit alleged to have accrued upon the transfer by the taxpayer of certain lands and buildings on July 1, 1919, to the Park Avenue Operating Co., Inc., a New York corporation, in exchange for the capital stock of that corporation. No part of this alleged item was included in the taxpayer's return as gross income for the calendar year 1919.

III. With respect to said payments made by the taxpayer to William S. Champ and E. Matilda Ziegler:

1. Under the will of the taxpayer's father, who died in 1905, a trust was created, of which the taxpayer was sole beneficiary, the income of which was payable to him as earned (after 1912), and the corpus of which was payable to him in four equal installments in 1916, 1921, 1926, and 1931. The taxpayer was at all times after his majority in 1912 entitled to qualify as one of the trustees under this trust, but did not qualify until after the death of one of the other trustees, William J. Gaynor (in 1913) and the resignation of the other two, William S. Champ and E. Matilda Ziegler (in 1919).

2. In 1918 the gross annual income of the trust was $648,529.03, which was the average normal income of the trust. The corpus of the trust was appraised, upon judicial accounting as of March 5, 1919, at $10,093,576.59. Had the corpus retained a constant value and the income a constant rate during the life of the trust and William S. Champ and E. Matilda Ziegler continued as trustees, they would have been entitled to receive, as trustees' commissions, approximately the following amounts during the periods indicated:

| | | |
|---|---:|---:|
| 1919–1921, upon income | $12,000 | |
| 1919–1921, upon principal | 18,000 | |
| Total | | $30,000 |
| 1921–1926, upon income | $20,000 | |
| 1921–1926, upon principal | 18,000 | |
| Total | | 38,000 |
| 1926–1931, upon income | $10,000 | |
| 1926–1931, upon principal | 18,000 | |
| Total | | 28,000 |
| Grand total | | 96,000 |

In 1919 William S. Champ was 51 years of age and had an expectancy of life of at least 12 years (he actually died in 1924) and E. Matilda Ziegler was 78 years of age and had an expectancy of 5.1 years (she is still living).

3. The trustees, William S. Champ and E. Matilda Ziegler, in 1919, were in complete control of the corpus of the trust, and by reason of that control had also control of certain corporations, stock in which was held by the trust. The active management was carried on by William S. Champ. The taxpayer became dissatisfied with his management of the trust and said corporations, and, in order to prevent mismanagement and waste of the assets of the trust, offered

to pay him $150,000 to resign as trustee. Champ made a counter-proposition, to the effect that both he and E. Matilda Ziegler would resign as trustees if the taxpayer would pay $150,000 to him and $50,000 to E. Matilda Ziegler.  A contract was made to this effect and $200,000 deposited by the taxpayer in escrow, which was turned over to the trustees, in the amounts named, when their resignations as trustees were accepted by the surrogate of New York County in August, 1919. Thereupon the taxpayer, under the terms of the will, qualified as trustee and entered into sole control of the trust. As an incident to the resignation of the said William S. Champ and E. Matilda Ziegler as trustees the taxpayer came into absolute control of all the properties of the trust estate and of the corporations and their subsidiaries controlled by the trust somewhat prior to the time when said control would normally have passed to him pursuant to the terms of the trust.

4. In his income-tax return for 1919 the taxpayer claimed as a deduction from his gross income for that year the sum of $200,000 so paid. This deduction was disallowed by the Commissioner, giving rise to the first point in controversy.

IV. With respect to the said income alleged to have accrued to the taxpayer by the said transfer of certain lands and buildings to the Park Avenue Operating Co., Inc.:

1. Between April 1, 1915, and July 1, 1919, the taxpayer acquired certain lands in the Borough of Manhattan, city, county, and State of New York and the buildings and improvements thereon at a cost of $7,386,766.23. In the case of each purchase a lump sum was paid for the lands, buildings, and improvements. Between the date of each purchase and July 1, 1919, no depreciation was written off said property nor was any depreciation thereon claimed by the taxpayer as a deduction from his income.

2. For convenience in maintaining and operating such properties in such matters as renewal of mortgages, execution of leases and dealings with tenants, the taxpayer adopted the plan of organizing the Park Avenue Operating Co., Inc., a New York corporation, and on July 1, 1919, transferred to it the said properties. The entire outstanding capital stock of said corporation was issued to the taxpayer or his nominees; 95 per cent of such stock was issued to the taxpayer and 5 per cent to his wife.

3. The taxpayer agreed with the said corporation that in transferring the said properties to it the transaction should yield him no profit. Upon the making of said transfer the taxpayer received from the corporation its common stock of a par value exactly equal to the cost to him of said properties less the mortgage indebtedness thereon then outstanding. The amount of stock so received by the taxpayer was arrived at pursuant to the agreement that the tax should yield the taxpayer no profit and in the belief that effect was being given to such agreement and without any appraisal or inquiry into the question of the value of such properties as of July 1, 1919, the date of the transfer.

4. The stock of the Park Avenue Operating Co., Inc., has never been on the market. There has never been a transfer of any such stock for a valuable consideration, nor has any offer ever been made for such stock.

5. When the taxpayer's attention was directed to the fact that the Commissioner was inclined to rule that such transaction had not been carried out in accordance with the taxpayer's said agreement with the Park Avenue Operating Co., Inc., but that on the contrary a profit had accrued, the taxpayer acquainted the directors of said corporation with the facts and offered to return to the corporation its comon stock of a par value equivalent to the profit which the Commissioner had found to have accrued, provided that at the same time the said corporation should reduce the cost of the said properties to it as such cost appears upon its books in a like aggregate amount as required by the agreement under which the transfer was originally made to the said corporation and provided further that both transactions be as of July 1, 1919. This proposal was accepted by the directors of the said corporation on September 19, 1923, and was consummated as of July 1, 1919. The amount of the stock returned by the taxpayer to the Park Avenue Operating Co., Inc., and likewise the amount by which the Park Avenue Operating Co., Inc., reduced the cost of the said properties upon its books as of July 1, 1919, was $237,259.21.

6. The buildings upon the properties in question were all of the type known as steel and concrete.

7. The taxpayer, in his income-tax return for 1919, showed no profit or loss resulting from such transfer of lands in exchange for stock of said corporation. The Commissioner in auditing said return increased the taxpayer's gross income by $228,650.77, an amount equal to 3 per cent of the value of the buildings transferred, such value being estimated by applying the ratio of value attributed on the local assessment rolls to the buildings, in comparison with the assessed value of land and buildings together, to the cost to the taxpayer of land and buildings together. This addition to gross income gave rise to the second point in controversy.

### DECISION.

The deduction by the taxpayer of $200,000, paid to the trustees in consideration of their resignation, should not have been taken in one year but should have been spread over the balance of the life of the trust ending July 21, 1931.

The sum of $228,650.77, by which the Commissioner has increased the taxpayer's 1919 income, is an improper addition and no part thereof should be added to such income.

The tax should be recomputed in accordance with the foregoing and with the following opinion. Final decision may be settled on consent or on seven days' notice by either party.

### OPINION.

IVINS: The first question before the Board arises out of the disallowance by the Commissioner of a deduction of $200,000 claimed by the taxpayer in his 1919 return, that amount representing a sum paid by him to two trustees of a trust, under which he was the sole beneficiary, in consideration of their resignations as such trustees.

The taxpayer was the sole beneficiary of a trust created by the will of his father, the terms of which provided that he should receive

the income (after his majority) and that the principal should be turned over to him in four equal installments as he reached the ages of 25, 30, 35, and 40. In 1919, when the taxpayer was 28, and after one-fourth of the original trust fund had been turned over to him, the balance of principal in the hands of the trustees amounted to upwards of $10,000,000; was yielding an average income of almost $650,000, and was being managed by two trustees, William S. Champ and E. Matilda Ziegler, the former actually carrying on the active management, which included the control through stock ownership of certain corporations. The taxpayer was entitled, under the terms of the will, to qualify as a trustee, but had not qualified. He was dissatisfied with the management of the trust and of the corporations controlled by it and, in order to eliminate the existing management and himself assume absolute control, he agreed to pay $150,000 to William S. Champ and $50,000 to E. Matilda Ziegler in consideration of their resigning as trustees. They resigned in August, 1919; the agreed payments were turned over to them and the taxpayer qualified as trustee and assumed complete control of the properties. If both of these trustees had served until the termination of the trust, their commissions on income and principal during the 12 years following would have amounted in the aggregate to approximately $96,000, and this amount was by their resignations saved to the trust and so to the taxpayer who was the sole beneficiary. The present value in 1919 of these prospective commissions was, of course, less than $96,000, especially in view of the fact that E. Matilda Ziegler was then 78 years old and had an expectancy of life of only 5.1 years. The payment by the taxpayer of $200,000 in 1919 might have been inspired, in part, by the desire to save these prospective commissions, but obviously could not have been inspired solely by that wish. In fact, the taxpayer testified that his only real motive in making the payment was to eliminate the existing management and secure to himself absolute control during the balance of the life of the trust without any interference in order that he might protect the assets of the estate from waste and other effects of bad management.

The taxpayer, in his income-tax return for 1919, treated this payment as a business expense and deducted it from his gross income. The Commissioner disallowed the deduction in its entirety. The elimination of the other trustees and the qualifying of the taxpayer as trustee did not vest in him a full ownership of the property, but merely put him in sole control under the instrument creating the trust and the laws governing trust estates. He was not, in effect, buying an asset which forthwith would become his property and the purchase price of which he could not take into consideration in computing his income until he should dispose of the property acquired, but he was rather buying the right to be sole trustee without interference over a period of 12 years. We think the Commissioner was wrong in not allowing any deduction, and that the taxpayer was wrong in claiming in one year, deduction of the entire amount paid. The taxpayer should be regarded as having for the purpose of insuring his interest in the estate against waste, purchased a right to do certain things for a period of time, and the cost to him of that right should be spread over the period of time during which he would be in a position to exercise it.

It was suggested that since E. Matilda Ziegler had only an expectancy of life of 5.1 years, the payment made to her should be spread only over that period, and it was also suggested that since the trust provided for periodical distributions of principal to the taxpayer, he would in time control a majority of the stock of the corporations held by the trust, and could thus control the management of those corporations; that the payment made by him should be spread only over the period during which he would remain a minority stockholder. William S. Champ died in 1924 and the suggestion had been made that the fact now being determined, the payment of $150,000 made to him should be spread only over the five years between his resignation and his death. All these suggestions seem to us fallacious. As a matter of fact E. Matilda Ziegler has outlived the expectancy of life attributable to her in 1919 and is still living. It would not necessarily have become the duty of the trustees to distribute the assets at the times provided for principal distribution by the trust instrument in such manner as to place the taxpayer in control of all, if any, of the corporations whose stock was held by the trust at any time prior to the final distribution in 1931. The trustees might in their discretion have changed the investments; they might have reduced portions of the trust estate to cash and distributed principal to the taxpayer in that form. Both of the trustees might have survived the entire life of the trust. The taxpayer desired not only the control of the corporations whose majority stock was held by the trust, but also control of all the other assets of the trust estate. Even after the principal distribution of 1926, when only one-third of the estate as it existed in 1919 would be in the hands of the trustees, injudicious management on their part might have reduced the value of the remaining corpus to the extent of more than the $200,000 which the taxpayer paid them for their resignations. What the taxpayer gave $200,000 for in 1919 was the right to exercise exclusive control of all the properties which might remain in the trust from 1919 until 1931 when the trust would terminate. He was interested in acquiring this right without regard to the possibility that one or both of the trustees might die or, for reasons of their own, resign before 1931, and without regard to the fact that there was a likelihood of his being in control of some of the corporations before 1931. He bought a right—which, except for the purchase of it, he might never have acquired—to act as sole trustee without any interference by any other trustee over a period of 12 years, and we think the investment thus made is properly recoverable by him out of income over the entire 12-year period, and not over any shorter period.

If he had been buying outright an asset with an indefinite life, the Commissioner would be correct in his contention that the taxpayer was entitled to no deduction, but could offset the cost against the sale price at such time as he might sell the asset; but the thing that the taxpayer bought had a definite life of 12 years, and under the well-established rules for recovery of capital he should be allowed to recover the cost over the period of the life of the asset.

The second point in controversy is with respect to an addition of $228,650.77 made by the Commissioner to the taxpayer's gross income for 1919.

In 1919 the taxpayer was the owner of real property consisting of land with concrete and steel buildings thereon in New York City. He had held these properties on the average for a period of a year and a half. They had originally cost him $7,386,766.23, and in his income tax returns he had not claimed any depreciation upon them. For convenience in managing these properties he caused a corporation to be formed in 1919 and conveyed the properties to the corporation in exchange for its entire capital stock. Not regarding the transaction as one yielding a then realized profit, he caused this stock to be issued in par value exactly equal to the cost to him of the properties, less the outstanding mortgages thereon. The amount of this capital stock in dollars and cents does not appear from the record and is unimportant, but for purposes of convenience in this opinion we will say that the stock so issued had a par value of $x$. The taxpayer had bought land and buildings for $x$ and held them for a year and a half and had exchanged them for $x$ par value of corporate stock.

Counsel for the Commissioner reasons as follows: The cost of this property to the taxpayer was $x$. He held it for a year and a half, during which time the buildings thereon depreciated, according to our methods of allocating cost to buildings and land, respectively, and of computing depreciation on this type of buildings, to the extent of $228,650.77. This depreciation should have been deducted by the taxpayer, and his failure to deduct it does not entitle him to treat the property as not having depreciated. So the depreciated cost to the taxpayer at the time he made the exchange in 1919 was $x$ minus $228,650.77. However, he sold the property for the equivalent in stock of $x$, and by this transaction derived a profit of $228,650.77.

The fallacy in this reasoning is that it requires a presumption that the stock received in exchange for the property was worth par. If the taxpayer had received $x$ in cash, the reasoning of the Commissioner's counsel might be sound. But he did not receive cash. It appears that the stock has never been on the market and none of it has ever been transferred for valuable consideration since its original issue in exchange for the property. The usual method of appraising stock issued for property where there is no evidence of the market value of the stock is to say that the stock is deemed equivalent in value to the property for which it was issued, and by determining the value of the property one can determine the value of the stock. In this case the Commissioner made no attempt to determine the value of the property except by reference to the par value of the stock, and he reasoned in a circle thus: We must determine the value of the stock received by the taxpayer. To do this we will look at the value of the property given. We have no evidence of the value of the property given except that stock to the extent of $x$ par value was issued for it. Therefore, the value of the property must have been $x$, and, consequently, the value of the stock received by the taxpayer must have been $x$. This amounts to nothing but saying that since the *par* value of the stock was $x$, its real value was $x$, a proposition to which the Commissioner would be

the last to accede, if applied generally. If the corporation had issued $2x par value of stock for his property, it is clear that the Commissioner would not permit it to claim invested capital at $2x. It is also clear that the taxpayer would not have derived a profit of $x. The reasoning presented on behalf on the Commissioner brings to mind the example of faulty syllogism given in an elementary text book on logic: If the sidewalk is wet, it must have been raining—if it has been raining, the sidewalk must be wet—therefore it has been raining.

When the taxpayer learned the position of the Commissioner, he said in effect: " Our bookkeeping must have been wrong and I will have the books corrected." He returned to the corporation $237,-259.21 par value of stock, and the corporation wrote down on its books the cost to it of the property to $x minus $237,259.21. The Commissioner refused to accept this as affecting the taxpayer's liability, but treated it as a gift by the taxpayer to the corporation. We think the only effect of the transaction was to place the corporate records on a proper basis, for we can not see how it could make any difference in the taxpayer's profit or loss whether he received for the property stock to the par value of $x, of $x minus $237,259.21, of $2x, of $10x, of $½x, or a number of shares of no par value. The stock received being the entire capital stock of the corporation was worth exactly the value of the property exchanged for it, and the par value of the stock so received is no evidence of the value of that property. If the buildings actually depreciated to the extent assumed by the Commissioner, that is, if they had a normal life of 50 years (a fact denied by the taxpayer), and if there were no appreciation of the market value of the property as a whole, the property would have been worth at the time of the transfer $x minus $228,-650.77. There is no evidence that the market value of the property was greater or less than the depreciated cost to the taxpayer, and consequently no evidence that the stock received in exchange for the property (even disregarding the fact of the return of stock to the corporation) was worth more than that depreciated cost. Accordingly, there is no basis for the Commissioner's conclusion that the taxpayer derived a profit of $228,650.77 from his exchange of property for stock. In the absence of such evidence, it must be presumed that the property, at the time of its exchange, was worth no more than its depreciated cost, especially in view of the fact that the time between purchase and exchange was only on the average a year and a half. In the absence of at least *prima facie* evidence, property can not be deemed to have increased in value to an amount exactly offsetting normal depreciation.

The addition of $228,650.77 to the taxpayer's gross income for 1919 was clearly erroneous, and any deficiency in tax resulting from such addition must be disallowed.

On consideration by the Board, STERNHAGEN and LITTLETON dissented as to the first point because they were of the opinion that the entire amount of $200,000 is deductible in the year in which it was paid.

SMITH and TRAMMELL dissented as to the first point because they were of the opinion that the amount of $200,000 is not deductible in whole or in part in any year.