S. T. SWENSON, EXECUTOR, ESTATE OF CHRISTINA SWENSON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 16177.   Promulgated December 10, 1928.

*E. D. Gatlin, Esq.*, and *R. H. Foster, Esq.*, for the petitioner.
*Bruce A. Low, Esq.*, for the respondent.

678

OPINION.

LOVE: Upon a consideration of the facts as set forth above, we are called upon to determine whether or not the exchange in 1919 of the oil lease in question for 2,400 shares of the capital stock of the Swensondale Oil Co. was such a transaction as gave rise to or produced any taxable income to the petitioner.

The attorney for the respondent truly says that the taxpayer's sole reliance must be in the provisions of the Revenue Act of 1918, and not in the subsequent modifications or ameliorations of the later acts, but the petitioner does not suffer by that limitation. Indeed, we are of the opinion that the 1918 Act is more to this taxpayer's purpose and benefit than those of later years might have been had the transaction occurred when such acts were effective.

There was less than 22 per cent of the 11,000 shares authorized that was offered for sale. The shares sold were not offered on the general market, but were sold to acquaintances of the one or more of the old stockholders at private sale. Had the whole issue been thrown on

the market it may well be assumed that such would have found pur-chasers, only at nominal prices under conditions as then existed and known. The evidence does not tend to show that there was a market, as that term is understood in the marts of trade, existing at date of issuance of the stock in question, which was the date of its receipt by the taxpayer.

It is a matter of general knowledge that drilling for oil, even under the most favorable conditions, is a highly speculative venture. A well almost wholly surrounded by paying properties only a few yards away, may, and often does, prove to be a worthless " dry hole " or a " gasser." In this case the indications, on April 17, 1919, when the stock of the Swensondale Oil Co. was increased, were, from any-thing to the contrary that appears in the record, at best no more than dubious. The well had been sunk about 2,200 feet with no indications of oil. On the other hand, some salt water had been encountered—always a bad sign—and gas at considerable pressure. There were a few wells in the territory, some completed and others still being drilled, but all of them were more than two miles away, the most productive ones lying principally toward the north and east, thus serving to indicate that the Swenson well might be upon the south-west edge of the oil pool, if there was one, or outside of it altogether.

The respondent introduced evidence by some experts in regard to the geological formation of the terrane into which the well was being driven, but sustaining expert opinions are not difficult to obtain, after the fact. Giving to this evidence its full weight, it does little or nothing to establish the contention of the respondent that the stock had a fair market value at par or more at any given time before oil was actually struck. In reply to the question of the respondent's attorney, " Is it possible under conditions such as you have described to bring in a large well within a reasonable distance of a dry hole? " the witness (Meredith) answered, " Very possible." Now if that be true, the converse of that proposition must unquestionably be true, the result at best is highly speculative, so that no expert opinion as to the characteristics of the terrane as a whole could afford any assurance as to the outcome of any par-ticular drilling operation. That is an event wholly dependent upon chance, though the probability of striking oil is of course greater in a " proven territory " than in one which is being prospected, as was the case in this field at that time. So that, admitting the full strength of the respondent's case, we are still of the opinion that the adverse considerations of the petitioner are the stronger, for the uncontrovertible fact remains that until oil is actually struck, no human prescience, though guided by the widest experience, can say with certainty that oil is there at the spot where the drilling is in progress.

The issue here is simply whether the fair market value of the stock received for the lease was in excess of the fair market value of the lease itself at the time of the exchange. If it was not, or if the fair market values of the lease or of the stock can not be determined as of that instant, there can be no taxable gain from the transaction. We are of the opinion that in the instant case no such excess of fair market value has been shown, nor has it been proven that either the lease or the stock exchanged therefor had any fair market value at the time the contract was executed and the lessor's rights determined and foreclosed thereby. The agreement of April 17, 1919, by which the leasehold was acquired by the corporation provided only for a subscription to the new capital stock, and did not constitute a sale of it, nor has it been shown that it was then known that even a single share of that portion that was to be offered for sale for cash could certainly be sold at any price. Nor does it affect the situation as it then existed that 2,350 shares of the stock were shortly thereafter sold by the trustee at par, nor that after the well " came in " some sales between individuals outside of the corporation were made at 200 or 300 or more. Up to the time of this action neither Peter Swenson nor his wife had ever sold a single share of that stock, nor actually realized one dollar of taxable profit from the appreciation of the stock, except what had accrued to them in the form of stock dividends.

The respondent relies to a considerable extent upon the recital in the amendment to the charter that the lease was of a reasonable value of $865,000 and more, but that was purely an arbitrary amount written in to meet the exigencies of the stock flotation in accordance with well recognized practice. The witness (Schow) testified that the amount of $865,000 was inserted at the request and insistence of the Secretary of State. He says that the intention was to put the increased valuation on sections 5 and 6 of the leased lands, but " the Secretary of State objected to us putting any further value on sections 5 and 6, and told us we could put a high value on section 49, and we could pass muster on the amendment to the charter. At the suggestion of the Secretary of State, Mr. Pool made the change in the instrument, and we signed it."

Q. Mr. Schow, in writing in that value in the contract and in the affidavit and any other papers from which it appears it has been discussed, was there an effort made to fix that value as representing any sales value of the leases at all?

A. No. There was no way of fixing it.

We are not unmindful of the fact that considerations other than those which appear in the record may have been known to or, at least, suspected by the owners and promoters of this enterprise,

which influenced them in the increase of stock at this time and may have materially assisted in its successful and prompt flotation, but no real weight can be attached to surmises of this kind. The answer to the question must rest wholly upon the known facts at the instant the agreement was consummated, and no other material facts than those herein recited appear in the record. It matters not that even the very next day or hour, occurrences might have increased the value of the oil lease a hundredfold, such sudden increases were supposedly admitted by the attorney for the respondent. But such sudden increase did not in fact occur in this case. The agreement was entered into on April 17, 1919, and the well did not " come in " until the early morning of May 18, one month later, and three days after the closing of the stock subscription books on May 15 of that year. That $235,000 of stock of a corporation holding a lease on unproven territory could be sold at par in less than a month may tend to create a suspicion that there were substantial grounds for hope that the well would prove a gusher, but nothing confirming such a suspicion appears in the record. It might serve as a testimonial to the assiduity of the promoters, but no other inference is warranted by the recorded facts.

We place no weight on the evidence that for a month in the early part of 1920, S. T. Swenson was in Chicago, attempting to dispose of the property for $21,000,000. Not only did the negotiations fail to materalize in any sale whatever, but their inception, according to the evidence, was not until the latter part of 1919, " quite a while " says Swenson, " after the well came in."

From the foregoing considerations we conclude that no taxable income accrued under section 202 (b) of the Revenue Act of 1918, to the estate of Christina Swenson, the petitioner, from the exchange of stock for a certain mineral lease on the lands owned jointly by herself and her husband under the community property laws of the State of Texas.

There is another question of law in the case. The respondent contends, inasmuch as the stock certificates representing the increase of 11,000 shares in the capital stock of the Swensondale Oil Co. were not in fact issued, because of an injunction, until January 6, 1920, at which time the stock may have had a fair market value, that therefore the petitioner is assessable in some amount. Aside from the fact that this contention involves another taxable year than the one under review, it is evident that this transaction was closed with the agreement of April 17, 1919, and that the physical receipt of the certificates of stock was merely an incident thereto, and that the date under which such certificates of stock were issued or upon which they were received is of no consequence whatever. The petitioner's rights and obligations must date from April 17, 1919.

The petitioner admits, by stipulation, the receipt of additional taxable income in the sum of $2,500 in the year 1919, which amount should be properly accounted for in the final computation.

*Judgment will be entered under Rule 50.*