AULT & WIBORG CO. OF NEW YORK, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

AULT & WIBORG CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

AULT & WIBORG CO. OF URUGUAY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 24375–24377.   Promulgated September 28, 1929.

*Laurence Graves*, *Esq.*, and *Alfred G. Allen*, *Esq.*, for the petitioners.

*Harold Allen*, *Esq.*, and *Stanley Suydam*, *Esq.*, for the respondent.

666

668

OPINION.

SMITH: The only issue involved in these proceedings is whether or not the 5,000 shares of stock in the Cincinnati Chemical Works, Inc., received by the Ault & Wiborg Co. on July 1, 1920, had any fair market value at that date, the petitioners having waived certain

allegations of error relating to, first, the reduction of cost by the amount of accumulated depreciation in computing the gain or loss resulting from the sale of the dye and chemical branch of the business, and, second, the computation of the tax liability of the Ault & Wiborg Co. under the provisions of section 328 of the Revenue Act of 1918.

Section 202 (b) of the Revenue Act of 1918 provides in part as follows:

When property is exchanged for other property, the property received in exchange shall for the purpose of determining gain or loss be treated as the equivalent of cash to the amount of its fair market value, if any * * *.

Consequently it appears that if the 5,000 shares of stock of the Cincinnati Chemical Works, Inc., received by the Ault & Wiborg Co. on July 1, 1920, had no fair market value on that date, the respondent erred in including the par value of such stock in the taxable income of the Ault & Wiborg Co. for the year 1920 and in proposing to assess proportionate parts of any deficiency occasioned thereby against the petitioners.

From the record it appears that prior to 1914 Germany was the source of supply for essential dyes and chemicals employed in the business of the petitioners and that as an incident of the World War it became necessary for the business to develop its own source of supply within the United States. This was done by the establishment of a dye and chemical branch of the Ault & Wiborg Co. at considerable expense, the operations of which, up until the year 1920, entailed heavy losses. Subsequent to the termination of the World War and beginning in the year 1920 dyes and chemicals manufactured in Germany again appeared in the United States markets and it became apparent to the petitioners that continued operation of the dye and chemical branch of the business would result in further heavy losses. That this was a reasonable anticipation is borne out by the results of the operations of the Cincinnati Chemical Works, Inc., as set forth in the findings of fact. Furthermore, in 1920 the United States was passing through a period of deflation and financial depression with the result that it was difficult to sell securities. Cf. *George S. Parker*, 10 B. T. A. 854.

It was admitted that the valuation of $500,000 placed upon the 5,000 shares of stock of the Cincinnati Chemical Works, Inc., by the respondent was arbitrary. It was argued on his behalf, however, that the Cincinnati Chemical Works, Inc., had no difficulty in establishing bank connections in Cincinnati and was enabled immediately after incorporation to borrow, without security and without the guarantee of its stockholders, the sum of $200,000 with which to commence operations. In this connection, however, it need only be

pointed out that the Cincinnati Chemical Works, Inc., owned unencumbered assets worth approximately $1,700,000 and that at the time it borrowed the $200,000 it had made no prior loans, and it is also significant that within the first year of its experience it became necessary for it to borrow sums approximately equal to the value of its assets. Under such circumstances we do not believe that the fact that the Cincinnati Chemical Works, Inc., was able to borrow $200,000 without security would indicate that its stock was worth par. It is clear that the dye-making industry in the United States in 1920 was yet in its infancy and the action of the three Swiss companies in purchasing the dye and chemical branch of the business of the petitioners reasonably may be regarded as speculative.

The petitioners presented the testimony of one of the vice presidents of a bank in Cincinnati, Ohio. This witness, with a background of more than twenty years banking experience and thoroughly familiar with business conditions in and around Cincinnati before and on July 1, 1920, and who had acquired first-hand knowledge of the financial structure and condition of the Cincinnati Chemical Works, Inc., as the result of negotiations through him by that company for a loan with which to start business, testified in part as follows:

Q. And in your opinion did the stock of the Cincinnati Chemical Works at the time, in 1920, have a fair market value?

A. I do not think we felt qualified to express an opinion; we looked upon it as a hazardous enterprise, as we had no idea what the effect of the opening up of imports from Germany would have; we felt rather relieved that he had sold that end of the business; we were glad that the industry would continue for Cincinnati, but as far as placing a value upon the common stock was concerned, we felt that it was in the "lap of the Gods"—utterly impossible to place any value on it from our point of view.

Q. In other words, you might consider it had a speculative value?

A. Entirely speculative; if that is a fair word for it.

Q. Well, would you consider that that stock had any value as collateral for a loan?

A. None whatever.

Q. In 1920 you are speaking of, of course?

A. Yes.

The petitioners also presented as a witness Irvin F. Westheimer, a resident of Cincinnati, who has been engaged in business since 1916 and is a member of the New York and Cincinnati Stock Exchanges, as well as a member of the firm of Westheimer & Co., stock and bond brokers and dealers in securities, maintaining offices in Cincinnati and Dayton, Ohio, Baltimore, Md., and Washington, D. C. He testified that the year 1920 was a period of very severe depression in the stock and bond business, commonly termed a panicky condition; that money conditions were very bad, that the securities mar-

ket was very dull, that it was extremely difficult to sell securities, and that the better class of securities was selling at a very low price. He further testified that in his opinion the stock of the Cincinnati Chemical Works, had absolutely no market value, that he would have absolutely refused to underwrite the stock issue of such a corporation and that he was confident that no reputable concern would have underwritten such a stock issue.

In his testimony appears the following question and answer:

Q. According to the evidence this is tangible property, principally tangible property; the cost to Ault & Wiborg Company, approximately one million seven hundred thousand dollars; now, the ownership of that property is represented by two million five hundred thousand dollars par value of the stock of the Cincinnati Chemical Works. Would it be your opinion that upon that showing alone that the stock of the Cincinnati Chemical Company had no fair market value, taking into consideration also the fact that new owners were coming in, apparently experienced chemical men?

A. If we were—if we had submitted to us a company that for four years had shown losses running from $200,000 to $300,000 a year, and then during the year of the sale should show a probable profit which they may have been able to show on July 1st—I do not know whether they could or not—the year of 1920 showed a profit of $200,000—I do not know what six months would have shown at that time, but even had they shown a profit of $100,000 or $200,000 to July 1st, with all of the circumstances that surrounded this branch of the Ault and Wiborg Company, I should say that stock would have absolutely no market value. Here is a company that shows constant losses; it is an industry created through most unusual circumstances—a World War—that has cut off the natural supply of the product that they were manufacturing. It was simply a matter of time until the old source of supplies would again begin to function, and if this company lost money steadily while the old sources of supply were cut off, I should say that the probability of their making money when the old sources of supply again began to flow was rather remote, and so far as three companies joining together—three very large and successful foreign companies joining together to start a company in the United States of America, I should say that the likelihood of their success was a gamble. We would not care to participate any in the flotation of their issue. Here is a company they are organizing without a dollar of working capital; it means there would have to be prior securities issued, prior loans, which would cover all of the value of that plant if it continued to operate as it had in the past, and any specified value that there might have been to that plant, under the hammer, perhaps would more than be eaten up by the prior issue, such as bank loans, preferred stock, note issues, bond issues, and there would have been nothing for the common stock. The value of a common stock is its earning power. I can cite to you Fleischmann stock which is a Cincinnati concern primarily, with a very small market value selling around a high price many many times its book value; it is selling on its earning power. I can name to you railroads that have very high book value and that earn very little money and that are selling at a very low price. The value of a common stock is the earning power of the corporation, and the earning power of this corporation was in red. I should say absolutely it had no market value. So far as these three foreign companies joining together, I should say that three would be very much weaker than one; what is everybody's job is nobody's job, and they would have to demonstrate to me their abil-

ity to make dyes and chemicals in the United States before we would be willing to put our name to a security of that nature. Its records were bad and its prospects were bad. I should say it had no market value whatsoever. We would not have bought the stock under any consideration, except upon instructions from the purchaser that came to us.

We are aware of the difficulties presented by proceedings before us involving valuations and we have indicated in numerous decisions that no set formula or rule can be employed in determining what a certain thing was worth at a given date or in determining whether or not it had a fair market value on that date. In *Portage Silica Co.*, 11 B. T. A. 700, we said:

> The determination of fair market value is largely a matter of judgment and various theories of valuation are useful only in so far as they support a result that comports with sound judgment.

In *James Couzens*, 11 B. T. A. 1040, we said:

> * * * The Board and its members do not have, and are not expected to have, peculiarly expert knowledge upon the value of securities or any other of the multitudinous questions of fact which arise in the vast number of cases before it. It can only decide the issues in any case by giving judicial consideration to the evidence properly in the record. Such evidence is not to be regarded, as expressed by respondent's counsel, as an "assistance" to the Board in discharging a duty imposed upon it, but as the proof and substantiation by the parties of the positions which they respectively present for adjudication. The function of the Board should not be confused with that of the Commissioner of Internal Revenue. The Commissioner's determinations are in aid of his administrative duty to see that taxes imposed are assessed and collected, and there are no methods prescribed for the ascertainment of the facts upon which such administrative determination must be based. The Board is outside this organization with a duty to hear and decide as between the taxpayer and the Commissioner upon a record publicly made in accordance with rules of evidence and procedure and subject only to appellate review by the courts of appeal. Aside from general matters well recognized as subject to judicial notice, it has in any proceeding no official knowledge except as gathered from the evidence therein, and its decision must reflect the preponderance of such evidence. To the extent that presumptions are considered, it is not because the Board chooses to employ them but because they are established in the law. We approach the problem of value, therefore, not as experts with the aid of the parties, but to judge impartially of the issue between conflicting interests, in the light of all the evidence.

In view of the foregoing, we are convinced from the record in this case that the 5,000 shares of stock of the Cincinnati Chemical Works, Inc., received by the Ault & Wiborg Co. on July 1, 1920, did not have a fair market value and that the $499,999 included by the respondent in the taxable income of the Ault & Wiborg Co. for the year 1920 should be excluded therefrom.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

MARQUETTE and STERNHAGEN dissent.