ANDREW B. C. DOHRMANN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 20658. Promulgated April 8, 1930.

*Ralph W. Smith, Esq.,* and *Homer Tooley, Esq.,* for the petitioner. *Eugene Meacham, Esq.,* for the respondent.

510

**OPINION.**

LOVE: The issues in this proceeding are (1) whether the petitioner realized a taxable profit in 1920 when he exchanged certain assets for 50 per cent of the stock of a newly organized corporation, and (2) whether salaries paid to the petitioner's wife are taxable to the petitioner.

The applicable statute in connection with the first issue is section 202 (b) of the 1918 Act, which, so far as is material, provides as follows:

When property is exchanged for other property, the property received in exchange shall for the purpose of determining gain or loss be treated as the equivalent of cash to the amount of its fair market value, if any; * * *

The petitioner contends that the 5,000 shares of stock of the A. B. C. Dohrmann Co. which he received in the exchange did not have any fair market value and that, therefore, he did not realize any taxable gain on the exchange. In his brief he also questions the constitutionality of section 202, *supra*, in so far as the section may be interpreted to provide for the possible determination of *income* from a transaction such as is involved in this proceeding, his contention being that such an interpretation would be contrary to the Sixteenth Amendment.

The respondent contends that the stock of the A. B. C. Dohrmann Co. had a fair market value equal to the fair market value of the assets exchanged therefor and that the difference between the cost or March 1, 1913, fair market price or value of the assets exchanged and the fair market value of the new stock received in exchange constitutes taxable gain to the petitioner. Working on this contention or theory of the case, the respondent determined that the fair market value of all the assets given in exchange by both the petitioner and his wife was the amount $1,151,575.95; that the fair market value of all the stock of the new company received in exchange by both the petitioner and his wife was the same, to wit, $1,151,575.95; that since each spouse received 50 per cent of the stock of the new company, the fair market value of the stock received by the petitioner was $575,737.97; that the cost or March 1, 1913, fair market price or value of the assets given in exchange by the petitioner was $374,818.58; and that the petitioner realized a taxable gain on the exchange in the amount of $200,969.39 ($575,737.97 minus $374,818.58).

The respondent in support of his contentions argues in his brief that:

It is quibbling to say that a stock, or other security, has no fair market value merely because no sales have been made of the security or because it is the opinion of those qualified to pass on the question that a purchaser, if one should be found, would buy only at a price considerably less than the intrinsic or book value of the security. Evidence of the latter character goes rather to a determination of the value of the security, fair market value or whatnot, than to a determination of whether the particular kind of property under consideration has a value. To hold for the petitioner on the issue here under consideration would amount to a determination by the Board that the closely-held stock of any corporation could not have a fair market value, a position which the respondent respectfully submits is entirely untenable.

No doubt Congress recognized that under certain circumstances it was possible for stock or any other property, at a given time, to have no fair market value, else it would not have added the words

"if any" in the statute. The "Advisory Tax Board" which was created by section 1300 (d) of the Revenue Act of 1918 took cognizance of such a possibility in its well considered Recommendation No. 57, published as T. B. R. 57 (I. C. B. 40). Upon several occasions we have decided from the evidence that certain property had no fair market value at the time in question. See *Joliet-Norfolk Farm Corporation*, 8 B. T. A. 824, as to second mortgage notes; *George S. Parker*, 10 B. T. A. 854, as to capital stock; *S. T. Swenson, Executor*, 14 B. T. A. 675, as to capital stock; *Helen Pitts Parker et al.*, 14 B. T. A. 1185, as to capital stock; *Will M. Ott*, 15 B. T. A. 867, as to capital stock; *Woodmar Realty Co.*, 17 B. T. A. 88, as to contracts; and *Ault & Wiborg Co.*, 17 B. T. A. 665, as to capital stock. To the same effect see *Bourn* v. *McLaughlin*, 19 Fed. (2d) 148, as to stock in family corporation; *O'Meara* v. *Commissioner*, 34 Fed. (2d) 390, as to capital stock; and *Heafey* v. *Allen*, 34 Fed. (2d) 941, as to capital stock.

We think it is well settled that whether property at a given date has a fair market value or not is a question of fact to be determined from all of the evidence introduced and admitted in each individual case; that no set rule or formula can be employed; and that in weighing and sifting the evidence the fact to be found, if it exists, is the cash price at which a seller willing but not compelled to sell and a buyer willing but not compelled to buy, both having reasonable knowledge of all the material circumstances, will trade. *Walter* v. *Duffy*, 287 Fed. 41; *Phillips* v. *United States*, 12 Fed. (2d) 598; *Heiner* v. *Crosby*, 24 Fed. (2d) 191; *O'Meara* v. *Commissioner, supra; Ault & Wiborg Co., supra;* and *James Couzens*, 11 B. T. A. 1040. Cf. *Ray Consolidated Copper Co.* v. *United States*, 268 U. S. 373. In *Phillips* v. *United States, supra,* the court at page 601 said:

> The law of the case seems perfectly plain. It is well settled that the fair market price or value of the property as of March 1, 1913, is a question of fact under all the circumstances of the case. No method of determining this value can be stated which will adequately meet all circumstances. The stock sales made from time to time are to be considered together with the nature and extent of the sales, and the circumstances under which they were made; hence forced sales, or sales of small lots, may often be no real indication of the value. The test is the fair market value. This may be defined to be the value of the property in money as between one who wishes to purchase and one who wishes to sell; the price at which a seller willing to sell at a fair price, and a buyer willing to buy at a fair price, both having reasonable knowledge of the facts.

Judge Davis in *Heiner* v. *Crosby, supra,* said at page 193 of his opinion:

The fair market price or value of stock at a particular time is a question of fact, to be determined from all the circumstances. Market price implies the existence of a market, of supply and demand, of sellers and buyers. Sales are always evidence of a market price, but the statute requires that, in " ascertaining the gain derived from the sale," there must be not simply a " market price," but a " fair market price."

After quoting section 202 (b), *supra,* the court in *O'Meara* v. *Commissioner, supra,* in reversing the Board's decision reported in 11 B. T. A. 101, said:

Under this section, where property is exchanged for other property, there is no taxable gain unless the property received in exchange has a value realizable in money's worth. If the property received in exchange does not have such a value, the exchange leaves the taxpayer where he was before the exchange. Such must be the construction of section 202 (b), if it is to be brought within the definition of " income " as laid down in *Eisner* v. *Macomber, supra,* because, if the value of the property received in exchange cannot be realized in money, then the profit in the transaction is not susceptible of being severed from the capital. * * * *A negative is always difficult to establish,* but we think appellants sustained the burden of proof, and established that the stock in question could not have been sold at a price approximating what the Commissioner determined to be its intrinsic value. (Italics ours.)

Earlier in the same opinion the court also said:

It seems clear to us that stock for which there is no market—which could not be sold, or could not be sold for an amount reasonably approximate to its real or intrinsic value—has no market value, within the meaning of section 202 (b) of the Revenue Act of 1918. It seems equally clear to us that such stock, which would have to be sacrificed by the holder in order to convert it into cash, does not have an exchangeable value, within the meaning of the definition laid down in *Eisner* v. *Macomber, supra.*

Before examining the evidence we deem it important to cite another well settled rule, namely, that the respondent's determination is *prima facie* correct and the burden of disproving it is upon the petitioner. *Avery* v. *Commissioner,* 22 Fed. (2d) 6; *William Reibert,* 7 B. T. A. 1198.

The evidence introduced on behalf of the petitioner consisted of his own testimony and that of three experienced bankers and the inheritance tax appraiser for the city and county of San Francisco. The respondent confined his evidence to certain financial statements of one of the companies whose stock was transferred to the new company and a few sales, all of which we have set out in our findings.

The petitioner testified that he would not have been willing in 1920 to have sold his stock in the new company for its intrinsic value or at any other price except a ridiculous one which no one would have paid; that there was no market for the stocks of The

Emporium, the Dohrmann Commercial Co. or the A. B. C. Dohrmann Co. in 1920; that he did not think any one would buy in a family concern except at a great sacrifice to the seller; and that it was his opinion that no purchaser could have been found for the stock of the A. B. C. Dohrmann Co. at the time he received it in 1920.

Mortimer Fleishhacker is a former president of the Anglo-California Trust Co. and the present vice president of the London Paris National Bank. He is an experienced banker, having been in that profession for about thirty years. He has constantly dealt with the marketability or salability of securities. It was his opinion that the stock of the A. B. C. Dohrmann Co. did not have a fair market value when received by the petitioner in 1920, and, when asked to state his reasons therefor, he testified as follows:

Various reasons, in the first place, due to its lack of salability and marketability, stock of this nature is not stock that can be readily sold, and could only be sold ordinarily at a great sacrifice. In fact in every case at a great sacrifice. There are many objections to stock of this kind; in the first place, it is a family affair, and people as a rule like to keep out of family matters. The stock was not listed upon any stock exchange, not even on the curb exchange. Stock of this kind could not be listed. It can't pass from hand to hand. It is not stock that could readily be used as collateral in making a loan. It would not ordinarily be considered first class collateral, and it is a class of stock that would be almost impossible to get a quotation on. It is generally the last kind of a collateral that a bank desires to take, and for that reason it would decidedly not have a fair market value.

He further testified that another disadvantage to stock of the kind in question was that the petitioner did not own or receive a majority interest in the company; that stock like this could not be sold except at a ridiculous sacrifice; and that one " can sell almost anything at some price, but the price would be so low and entirely at variance with the intrinsic value of the stock you might say it is unsalable."

R. M. Sims occupies the position of vice president and trust officer of the American Trust Co., a ninety to a hundred million dollar institution. He has been connected with that company since the year 1909. He also testified that in his opinion the stock in question did not have a fair market value on October 1, 1920, and gave substantially the same reasons as did the previous witness Fleishhacker. Sims thought that if the stock in question could be sold at all, it would have to be at a sacrifice of at least 60 per cent of its value.

Frederick L. Lipman has been engaged in banking in the City of San Francisco for the past 46 years. For the past 9 years he has been president of the Wells Fargo Bank & Union Trust Co. He testified that in his opinion the A. B. C. Dohrmann Co. stock did not

have any fair market value on or about October 1, 1920. His principal reasons for such a conclusion were that the 5,000 shares in question constituted a minority interest in a family corporation; and that they could not be marketed except at a sacrifice.

J. S. Lamson, an attorney at law, has occupied the position of inheritance tax appraiser for the City and County of San Francisco during the past 18 years. Some of the reasons he gave as to why in his opinion the 5,000 shares of stock received by the petitioner in October, 1920, had no fair market value were that " market value for a security presupposes the existence of a market "; that " market implies more than one buyer and more than one seller "; that " market for this type of security in this vicinity at that time never did exist "; that " people who form family corporations do not form them for the purpose of selling securities to the public "; that " in fact they usually form them for the purpose of keeping intact family holdings which are more or less private affairs "; and that his answer would be the same even if it were a fact that the assets which were transferred to the new company had a fair market value at the time they were so transferred.

The only evidence which the respondent introduced was evidence tending to support the theory upon which his determination was based, namely, that the *assets* back of the stock in question had substantial intrinsic values. In *Tsivoglou* v. *United States*, 27 Fed. (2d) 564, the court in construing the words " fair market value " as used in section 202 (b), *supra*, said at page 566:

The Board of Tax Appeals, in cases cited, has evidently proceeded on the theory that, if the property received in exchange has no market value established by actual sales, it may proceed to determine the value of the stock by ascertaining the value of the property represented by the stock, and that such value for the purposes of section 202 (b) may be deemed the fair market value. *Appeal of W. Zeigler, Jr.,* 1 B. T. A. 186; *Appeal of Charles T. Plunkett, et al.,* 3 B. T. A. 1265.

The federal courts, however, have refused to sanction this method when it was applied for the purpose of establishing a gain resulting from a transfer of property to a corporation in exchange for the shares of its stock, there being no market for the shares. *Bourn* v. *McLaughlin* (D. C. 19 F. (2d) 148.

The above case was affirmed by the Circuit Court. See *Tsivoglou* v. *United States*, 31 Fed. (2d) 706. See also *O'Meara* v. *Commissioner, supra*.

It is our conclusion that the above holdings are but another way of saying that if, in *fact* the evidence in each case proves that the property in question has " no fair market value " on the date involved, neither the taxing authorities nor the courts have authority

to construct such a value by means of any set rule or formula. The evidence introduced and admitted in each case is the controlling factor. Applying what we have said to the evidence in the instant case, we believe that the petitioner has overcome the burden that was his, and has proved, as far as this proceeding is concerned, that the 5,000 shares of the A. B. C. Dohrmann Co. stock at the time received by him on or about October 1, 1920, had no " fair market value " within the meaning of that term as used in section 202 (b) of the Revenue Act of 1918. It follows that the respondent was in error in including in the petitioner's taxable income for the year 1920 the amount of $200,969.39.

In view of the foregoing it is not necessary to discuss the constitutional question or to grant the second hearing mentioned in our preliminary statement.

In connection with the second issue the petitioner contends that the salary received by his wife from the A. B. C. Dohrmann Co. during the years 1920 and 1921 was her separate property, and was correctly returned by her as such in the first instance. The respondent determined that the salary received by the petitioner's wife was, under the laws of the State of California, community property, and upon the authority of *United States* v. *Robbins*, 269 U. S. 315, he included such salary in the petitioner's taxable income for the years 1920 and 1921, respectively.

Since the hearing in the instant case, the Supreme Court has handed down its opinion and decision in the case of *Lucas* v. *Earl*, 281 U. S. 111. In that case the court held that the question,

turns on the import and reasonable construction of the taxing act. There is no doubt that the statute could tax salaries to those who earned them and provide that the tax could not be escaped by anticipatory arrangements and contracts however skilfully devised to prevent the salary when paid from vesting even for a second in the man who earned it. That seems to us the import of the statute before us and we think that no distinction can be taken according to the motives leading to the arrangement by which the fruits are attributed to a different tree from that on which they grew.

Under the *Earl* case, we hold that the salary in question was correctly returned by the wife who earned it.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

MURDOCK concurs on the first point and dissents on the second.