**Harriet T. RIGHTER, Executrix of the Estate of Jessie H. Righter**

**v.**

**The UNITED STATES.**

**No. 37–67.**

United States Court of Claims.

March 19, 1971.

Davis, J., dissented in part and filed opinion in which Laramore and Durfee, J., joined.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

SKELTON, Judge.

We are indebted to Trial Commissioner Saul R. Gamer in this case for his findings of fact and conclusion of law and also for his opinion in which he held that the plaintiff was entitled to recover. We have adopted his findings of fact with minor changes and have used much of his opinion. The opinion of the court follows:

Miss Jessie H. Righter, a resident of Brooklyn, New York, died on April 24, 1961. The federal estate tax return filed on July 24, 1962, by her executors, which valued the assets of the decedent as of the date of death, reported a tax liability of $42,467.55, but the Commissioner of Internal Revenue, on June 25, 1965, assessed a deficiency in estate tax due of $74,833.91, together with interest thereon in the amount of $14,912.45, totaling $89,746.36. After payment of the asserted deficiency, the filing of a claim for refund, and the passage of more than six months during which the Commissioner took no action with respect thereto, the executors [1] filed the petition herein seeking a refund of said amount of $89,746.36.[2]

Included in the assets of the estate were stocks and bonds upon which the return placed a total value at date of death of $593,024.80. There were 24 items of such securities listed. The Commissioner's notice of deficiency changed the values set forth in the return of ten of such items. The valuation changes in nine of the items were small and no issue arises in connection therewith. The change in one of the items was substantial, however, and ac-

---

Scott P. Crampton, Washington, D. C., attorney of record for plaintiff. William J. Cosgrove, Wrenn & Schmid, Brooklyn, N. Y., Stanley Worth, and Worth & Crampton, Washington, D. C., of counsel.

E. Alan Moorhouse, Washington, D. C., with whom was Asst. Atty. Gen., Johnnie M. Walters, for defendant. Philip R. Miller and Joseph Kovner, Washington, D. C., of counsel.

1. The executors were Miss Harriet T. Righter and Miss Katharine A. Righter, the decedent's sisters. Subsequently Katharine died and Harriet, the surviving executrix, became the plaintiff herein.

2. Plus such other amounts as may be allowable as a result of a deduction for the fees and expenses incurred in this proceeding, and interest and costs as provided by law.

counts for a large part of the asserted deficiency. That item consists of 337 shares of Selchow & Righter Company, a New York corporation. The return valued this stock at $424.90 per share for a total valuation of $143,191.60, but the Commissioner concluded that the stock had a fair market value of $1,000 a share, making a total valuation of $337,000.

Another adjustment made by the Commissioner in the return related to a charitable deduction. The decedent's will creates a trust of her residuary estate, the income from which is to go to her two sisters for their lives. Upon the death of the survivor, certain general legacies are to be paid from the residuary estate, and the balance of such estate is then to go to certain named charities. To ascertain the charitable deduction to which the estate is entitled by reason of these provisions of the will, it is necessary to calculate the amount of the remainder interest of the residuary trust which will go to charity. In making such calculation, the executors used the same value of $424.90 per share of Selchow & Righter (hereinafter "S & R") stock. The charitable deduction claimed by the estate in the return was $385,821.20,[3] but in his notice of deficiency the Commissioner reduced such deduction by $68,270.72. This reduction apparently reflects the reduced amount which will be available for charity because of the greater tax liability resulting largely from the aforementioned increase in the S & R stock valuation. For the purpose of calculating the amount of the charitable deduction, the Commissioner did not change the $424.90 per share value of the S & R stock used by the executors.

The executrix here argues that the Commissioner, in calculating the values of the stocks and bonds as of the date of death, erred in increasing the value of the S & R stock to $1,000 per share. She says the value of $424.90 set forth in the return was proper. She further contends, alternatively, that if a higher value is to be used for such purpose, then the same higher value should be used in calculating the remainder interest of the residuary estate and the resulting charitable deduction. Such a higher value would, she continues, result in a calculation of a greater amount available for charity under the terms of the will and, therefore, would entitle the estate to a larger charitable deduction than would result from the use of the $424.90 figure.

## THE ISSUE OF THE FAIR MARKET VALUE OF THE S & R STOCK

S & R is a comparatively small corporation engaged in the business of manufacturing and selling games. Its plant and principal place of business are located at Bay Shore, Long Island, New York. During 1960, the last full year prior to the date of decedent's death on April 24, 1961, the company's net sales totaled approximately $3,200,000. As of such date of death, when the 337 shares of the company's stock in the estate are to be valued, there were only 2,000 shares of S & R stock outstanding.

S & R was established over 100 years ago by its cofounders, Mr. Selchow and Mr. Righter. Just prior to the death of the decedent, 1,018 of the 2,000 outstanding shares, or slightly more than one-half, were owned by the three Righter sisters, who were the daughters of one of the cofounders. As stated, the decedent, Miss Jessie H. Righter, owned 337 shares. Miss Katharine A. Righter, one of the executors (since deceased), also owned 337 shares, and Miss Harriet T. Righter, the surviving executrix (the plaintiff herein in her representative capacity), owned 344 shares. The balance of 982 shares was owned by 21 individuals and estates. A substantial number of the other shareholders were descendants of the other cofounder.

3. There is no dispute concerning the formula used to determine the amount of the remainder interest of the residuary estate, the factor used to compute such interest being taken from the actuarial tables contained in the Commissioner's regulations.

This closely held stock was not listed on any stock exchange, nor was it available on any over-the-counter market. It has never been publicly traded.

As of the date of the decedent's death, S & R's principal products were two games which were sold under the trademarks of "Scrabble," a crossword puzzle game, and "Parcheesi," a backgammon game. Scrabble was by far the company's main item of support. In 1960, it alone furnished over 60 percent of the company's business.

Miss Harriet Righter, the executrix and plaintiff herein, has long been closely associated with and actively engaged in the running of the business. For over thirty years, *i. e.*, from 1923 to 1955, she was its President and devoted full time to the company. Since then, she has continued to serve actively as Chairman of the Board of Directors. In 1955, Mr. C. Ellsworth Tobias became its President. Mr. Tobias, a lawyer, was a partner in a firm which had been the personal attorneys of the Righter sisters. He had served as a director of the company since 1947.

Ascertaining the fair market value of infrequently sold, unlisted, closely held stock is recognized as a difficult legal problem. See Central Trust Company v. United States, 305 F.2d 393, 399, 158 Ct.Cl. 504, 514 (1962). A common and accepted technique used by financial analysts and experts in such situations is to obtain, as a basic starting point, the prices of the stocks of corporations in the same or a similar business which are traded on an exchange; to develop some relationship between such prices and the per share earnings, dividends, and book values of the stocks; and then, after some indication, as a result of comparison, of what the closely held stock would sell for on the same basis of relationship to its earnings, dividends, and book value were it also actively traded, to make the necessary refinements and adjustments in such hypothetical comparative selling price as are justified by differ-ences between the unlisted company and those listed which informed investors would reasonably take into account.

This comparative appraisal method is so logical and so highly regarded that it has found its way into the 1954 Internal Revenue Code provisions concerning estate and gift taxes. Section 2031, "Definition of gross estate," subsection (b), "Valuation of unlisted stock and securities," provides that:

> In the case of stock and securities of a corporation the value of which, by reason of their not being listed on an exchange and by reason of the absence of sales thereof, cannot be determined with reference to bid and asked prices or with reference to sales prices, the value thereof shall be determined by taking into consideration, in addition to all other factors, the value of stock or securities of corporations engaged in the same or a similar line of business which are listed on an exchange.

The comparative appraisal method produces, nevertheless, no magic formula which rigidly gives the exact valuation answer. Companies are rarely identical in size, operation, or product, and allowances must be made, as the statute says, for "all other factors." This would necessarily include the very fact of unmarketability of the stock of the closely held corporation. In the last analysis, much necessarily depends on the informed judgment of the knowledgeable investor concerning the refinements and adjustments to be made in arriving at the ultimate valuation figure. Thus it is not surprising that in this field the opinions of experts are considered to be peculiarly appropriate. Central Trust Company v. United States, supra, 305 F.2d at 399, 158 Ct.Cl. at 514; Bader v. United States, 172 F.Supp. 833, 836 (S.D. Ill., 1959). The pertinent regulations specifically so recognize. Section 20.2031–2 of the Treasury Regulations on Estate Tax (1954 Code) provides that where

(f) * * * actual sale prices and bona fide bid and asked prices are lacking, then the fair market value is to be determined by taking the following factors into consideration:

* * * * * *

(2) In the case of shares of stock, the company's net worth, prospective earning power and dividend-paying capacity, and other relevant factors.

Some of the "other relevant factors" referred to in subparagraphs (1) and (2) of this paragraph are: the good will of the business; the economic outlook in the particular industry; the company's position in the industry and its management; the degree of control of the business represented by the block of stock to be valued; and the values of securities of corporations engaged in the same or similar lines of business which are listed on a stock exchange. However, the weight to be accorded such comparisons or any other evidentiary factors considered in the determination of a value depends upon the facts of each case. Complete financial and other data upon which the valuation is based should be submitted with the return, including copies of reports of any examinations of the company made by accountants, engineers, or any technical experts as of or near the applicable valuation date. [26 C.F.R. § 20.2031–2 (1969).]

In this case, however, plaintiff did not attempt to sustain the $424.90 per share valuation of the S & R stock contained in the return by anything resembling the comparative appraisal method or by any expert testimony. Instead, she relies principally on a sale of the very stock here involved which she and her coexecutor themselves made to Mr. Tobias, the company's President, his mother, and his wife. The sale was made on July 12, 1961. On that date the sale of 200 shares was completed at $424.94 per share, 100 shares being sold to Mr. Tobias and 100 shares to his mother. Such price was 50 percent of the stock's book value as of the close of the preceding year (the company's books, pursuant to an annual audit, being closed once a year at the termination of the calendar year), less the amount of the dividend paid during the early part of the year from the earnings of the prior year. This "ex dividend" price, coming so closely after the date of death, produced a figure which was 50 percent of book value both as of the date of death and as of the date of sale. On July 12, 1961, the executors and Mr. Tobias also agreed that Mr. Tobias would, on April 5, 1962, purchase the balance of the 137 shares at a price which would be calculated on the basis of 50 percent of the book value of the shares on such date, again "ex dividend," such "ex dividend" price, consisting of the book value as of the previous December 31, less the dividend, being considered as producing a figure representing book value as of the date of sale. On April 5, 1962, such sale of the balance of the shares in the estate was effected on such basis (at a price of $473.40), 100 shares being purchased by Mr. Tobias and 37 shares by his wife. It was subsequent to the completion of the sale transaction on April 5, 1962, that the executors, on July 24, 1962, filed the estate tax return with the S & R shares valued at $424.90 as of the date of the decedent's death on April 24, 1961, such valuation being calculated on the same formula basis as the sale of the 200 shares to Mr. Tobias and his mother.

The sale of the stock to the Tobiases at 50 percent of book value shortly after the death of the decedent was, plaintiff argues, an arm's-length transaction made in good faith by parties who believed that the 50 percent book value price represented fair market value. The best measure of fair market value, it is contended, is such a sale price arrived at by parties dealing independently in their own interests. The guiding principle is, plaintiff points out, as stated by the court in Fitts' Estate v. Commis-

sioner of Internal Revenue, 237 F.2d 729, 731 (8th Cir., 1956):

> * * * In determining the value of unlisted stocks, actual sales made in reasonable amounts at arm's length, in the normal course of business, within a reasonable time before or after the basic date, are the best criterion of market value.

Since there is such valid evidence of fair market value based on an arm's-length transaction, it is wholly unnecessary, and would be improper, plaintiff argues, to resort to hypothetical prices derived from such techniques as the comparative appraisal method, the use of which is justified only as a last resort when, as both the statute and the regulations make plain, actual bona fide sales prices are lacking.

The fair market value of the stock based on this one sale transaction alone is not controlling. "* * * [I]solated sales [of the stock] of closely held corporations in a restricted market offer little guide to true value." Central Trust Company v. United States, supra, 305 F.2d at 402, 158 Ct.Cl. at 519, and cases there cited. Further, certain circumstances pertaining to this particular sale transaction serve to prevent it from falling entirely into the prerequisite "arm's-length" category. The price at which the sale was effected was not one that resulted from the usual type of bargaining or negotiation based on factors normally applicable to stock valuation. Instead, it was a price that was set by the plaintiff herein without any negotiation. And plaintiff, in turn, took the 50 percent book value price formula from a directive in her sister's will. Under the will, the decedent "authorize[d] and direct[ed]" that at the termination of the aforementioned trust of the residuary estate, the trustees

> * * * shall at such time give to the then officers of Selchow & Righter Co. the preferential opportunity to purchase the shares of said company * * * at a price equal to fifty per

cent (50%) of the book value per share as of the time of my death, which, in my judgment, will be a fair and reasonable price therefor.

Under the will, the decedent appointed her sister Harriet, the plaintiff herein, and Mr. Tobias to be the trustees. However, the decedent plainly did not wish to prevent Mr. Tobias, as an officer of the company, from purchasing the stock simply because he was a trustee, for the will went on to provide that:

> * * * Authority is hereby conferred, in such circumstances, at such time or times, upon the Trustees and Executors to make sales upon such terms to such an officer at the time of sale even though such officer be at such time a Trustee or Executor hereunder.

Furthermore, the will, by the following provision, authorized such a sale of the stock at any time during the existence of the trust provided the sister-beneficiaries consented:

> * * * During the period of the trust, a like authority with respect to sale and purchase by and to a Trustee or Executor of some or all such shares of Selchow & Righter Co. * * * as shall be held at the time in the trust, is hereby given if such of my sisters as shall be living at the time thereof shall consent thereto.

It was under this provision that the sale herein was effected.

Thus, the sale was here made by the executors, one of whom was a trustee, to the cotrustee, the selling executor-trustee also being Chairman of the Board of S & R, and the cotrustee qualifying as a purchaser by virtue of his falling into the "preferential" category of an S & R officer (its President), with the sale price on such sale (i. e., of the 200 shares) being fixed by the formula contained in the will, namely, "a price equal to fifty percent (50%) of the book value per share as of the time of my death."

■ Of the three factors usually given consideration in attempting to arrive at the fair market value of an unlisted, closely held stock—earnings, dividends, and book value—book value is fairly considered to be the least important in the case of a manufacturing company with consistent earnings and dividend records, as was S & R. Central Trust Company v. United States, *supra*, 305 F.2d at 410–411, 158 Ct.Cl. at 533–534.

Under the peculiar circumstances here involved, the sale upon which reliance is placed cannot be considered as the type of private transaction that would alone qualify as establishing fair market value. Mr. Tobias had a special relationship with both the decedent and the executrix, having been, before becoming S & R's President, a partner in the law firm that acted as their personal attorneys. He had long been a director of the company. Since 1955, he has worked actively with the executrix, who is Chairman of the Board and who preceded him as President. Mr. Tobias was the only one to whom this stock was offered, and the decedent not only made him a trustee of her residuary estate, but in another part of the will provided that, if her sisters predeceased her, her personal property should go "to my friend, C. Ellsworth Tobias, if living at the time of my death." In cases such as this, "the burden is upon the taxpayer to demonstrate that the sales relied upon are arm's length sales in the normal course of business." Fitts' Estate v. Commissioner of Internal Revenue, *supra*, 237 F.2d at 731.

The court has considered this sale along with all the other evidence on the question of fair market value, but has given but little weight to it.

■ The same is true with reference to the evidence of Miss Harriet Righter and Mr. Tobias. Both testified that in their opinion the fair market value of the stock was 50 percent of its book value. Neither qualified as an expert in this particular field. However, both had long been associated with the company. Miss Harriet Righter was a stockholder of the company and had been its president for over thirty years (1923 to 1955) and during this period devoted full time to actively running the business. Since 1955, she has served actively as Chairman of the Board of Directors. Under these circumstances she no doubt knew more about the company than anyone who testified in this case. She was entitled to give her opinion as to the value of the stock. Next to Miss Harriet Righter, the person who was the most knowledgeable as to the affairs of the company was Mr. Tobias. He had been the attorney for the Righters for many years and had been a director of the company since 1947. He became its president in 1955 and was serving in that capacity at the time of the sale of the stock in 1961. This shows that he was an official of the company for over 14 years and was actively engaged in running the company, to say nothing of his prior knowledge of its affairs. We think he was entitled to give his opinion as to the value of the stock. His opinion and that of Miss Harriet Righter have been considered by the court along with all the other evidence, but, notwithstanding their intimate knowledge of the company and their honesty in giving their opinions, under the rules followed by the courts in establishing fair market value of stock, we have been unable to give much weight to their opinions.

Other evidence which plaintiff offers in support of the estate's 50 percent of book value formula is the administrative treatment of several other estates which similarly had, among their assets, various amounts of S & R stock. Plaintiff shows that in the cases of six other estates, in which the dates of the decedents' deaths ranged from July 16, 1956, to October 1, 1962, and the number of S & R shares varied from 29 to 108, the values of the shares that were accepted by the Internal Revenue Service ranged from $235 to $450 per share, and that for the five estates for which the record shows the pertinent data, such values were approximately 50 percent of

book value (at the end of the year preceding the date of death) or even less.[4]

█ The valuations accepted by the Internal Revenue Service in the cases of other estates, involving the same stock and other death and valuation dates, are of probative value in the solution of the problem involved in this case and must be considered. Stocks necessarily have different values on different dates. Numerous considerations enter into the determination of value on any particular date or the acceptance of certain values set forth in any particular estate tax return. Each case necessarily stands on its own facts.

In the first two estates in point of dates of death, i. e., July 16, 1956, and November 20, 1958, approximately five and two and one-half years, respectively, prior to the date herein involved, the estate tax returns valuing the shares at $235 and $275 per share, respectively (which were 36.2 percent and 39.4 percent of book value, respectively, at the end of the years preceding the dates of death), were simply accepted as filed. There is no evidence to indicate that any investigation was made by the Internal Revenue Service into the value of the blocks of 99 and 108 shares of S & R stock included in the assets of the estates.

On the third estate, in which the date of death was June 13, 1959—almost two years prior to the date herein involved— the 38 shares included in the estate were valued in the return at $275 per share. The evidence shows, however, that, in connection with its examination, the examining Internal Revenue Service office in Brooklyn, New York, obtained financial statements covering S & R's operations for prior years, and subsequently determined a deficiency based in part on increasing the fair market value of the stock to $450 per share, a deficiency which the estate apparently did not contest. The increased value constituted 58.7 percent of book value as of December 31, 1958, i. e., the end of the year preceding the date of death.

On the fourth estate, in which the date of death was December 30, 1959— only six months after the date of death involved in the third estate—the 99 shares included in the estate were valued in the return at $325. In this instance too, the examining Revenue Service office (in Connecticut) obtained financial statements covering S & R's prior years' operations. The examiner originally concluded that the value per share ranged from $1,200 to $1,250, but his report shows that the estate objected to such proposed valuation and pointed out that in the recent above-mentioned third estate in the Brooklyn District, a value of $450 had been arrived at. The Connecticut examiner then concluded that acceptance of a $450 valuation would be justified in his case too in view of a provision in the Internal Revenue Service Manual stating that: "Where a valuation has been made in a prior estate, it may not be necessary to make another detailed analysis of the stock in the current investigation, provided the valuation date on the prior estate is within reasonable proximity to the current date and the pertinent facts have not changed substantially." The Connecticut examiner stated that the Brooklyn office examiner had the pertinent financial state-

4. As shown by the following table:

| Date of death | Number of shares | Value per share reported | Value per share accepted by IRS | Ratio of value to book value (at end of preceding date of death) (Percent) |
|---|---|---|---|---|
| July 16, 1956 | 99 | $235 | $235 | 36.2 |
| November 20, 1958 | 108 | 275 | 275 | 39.4 |
| June 13, 1959 | 38 | 275 | 450 | 58.7 |
| December 30, 1959 | 99 | 325 | 450 | 58.7 |
| December 16, 1960 | 29 | 450 | 450 | 53.8 |

ments, and "[s]ince the determination of fair market value is a question of fact, no doubt the [Brooklyn] examiner took into account all the circumstances to arrive at the value of $450.00." He was "reluctant to press for a higher figure" because he felt that to do so "would appear to defeat the purpose of the paragraph in the Manual, which is to provide a means of obtaining uniformity in current valuations of a particular stock regardless of the district involved." Upon review of the examiner's recommendation, the reviewer suggested an $800 a share valuation, but the ultimate determination by the Connecticut District was the $450 recommended by the examiner, which the estate apparently accepted. (As was the situation on the third estate, this figure was 58.7 percent of the book value as of December 31, 1958.)

In the fifth estate, in which the date of death was December 16, 1960—about four months prior to the decedent's death herein—the estate tax return valued the 29 shares of S & R stock included in the estate's assets at $450 per share. (This was 53.8 percent of book value as of December 31, 1959.) The return was accepted as filed. There is nothing to indicate that any investigation was made of the fair market value of the 29 shares as of the date of death.

Similarly, in the sixth estate, in which the date of death was October 1, 1962—almost a year and a half subsequent to the date of death here involved—the estate tax return also valued the 104 shares of S & R stock included in the estate's assets at $450 per share. The record does not indicate what the book value of the S & R stock was as of December 31, 1961, a date subsequent to the decedent's

death. Accordingly, the relationship of this figure to book value is not shown. However, even if it be assumed that the figure was approximately 50 percent of book value,[5] there is nothing to indicate that the Internal Revenue Service made any investigation into the valuation of the stock set forth in the return, which was simply accepted as filed.

The plaintiff contends that the valuations accepted by the IRS for the stock of this company in these other estates are controlling and binding on the IRS regarding the fair market value of the stock in our case. On the other hand, the defendant argues that the valuations in such other estates should not even be considered by the court on the question of value here. We do not agree with either party, but follow a somewhat middle course between their widely divergent views. It is our opinion and we hold that while the values placed on this stock by the IRS in the other estates is not determinative of the question of value, in a case such as this where there is no sure way of arriving at the true market value, the value so placed by the IRS in the other estates is some evidence which may be considered.

Accordingly, it is our view that the action taken by the IRS in the six other estates in approving the value of the identical stock at about the date of the death of our decedent at from 36.2 to 58.7 percent of book value ($235 to $450 per share) is evidence we may consider in solving the problem before us. This is especially true with reference to the third and fourth estates where investigations were made as detailed above, and the valuations of $450 per share (58.7 percent of book value) were fixed in both estates after the investigations were

---

5. This would appear to be a valid assumption in view of the $473.40 price which Mr. Tobias and his wife paid for the 137 shares on April 5, 1962, which represented 50 percent of book value as of December 31, 1961, less the dividend paid, in an amount not shown by the record, the early part of 1962. Thus, such $473.40 price was less than 50 percent of book value as of December 31, 1961, necessarily making the $450 valuation in the sixth estate similarly less than 50 percent of such book value as of such date.

made. It should be noted that in the fourth estate, the examiner originally fixed the value at from $1,200 to $1,250 per share, but finally recommended $450 after his investigation was concluded. However, the reviewer suggested $800 per share. The "Connecticut District" determined that the value should be $450.

Other evidence and factors favorable to the position of the plaintiff on the fair market value of the stock, besides the statement of the testatrix in her will, the opinions of Miss Harriet Righter and Mr. Tobias, and the valuations of identical stock fixed by the IRS in the six other estates, are the following:

1. The 337 shares represented a minority interest of only 17 percent of the company's stock and lacked marketability.

2. The company only produced two products (games called Scrabble and Parcheesi).

3. The company was engaged in a luxury type business that was subject to fluctuation.

4. The business of the company was subject to lively competition from larger companies.

5. The principal product of the company was a game called Scrabble which it did not own and which it produced under a license from the owner.

6. Sixty percent of its business was from sales of Scrabble.

7. Through the years, the company had been unable to develop new products.

8. The company was relatively small compared to other companies in the entertainment field.

9. The company had recently lost the services of key sales personnel in the persons of Mr. Anderson and Miss Stringer.

10. The owner of Scrabble had the right to compete with S & R in the manufacture and sale of the game and did so as to luxury types thereof.

11. The owner of Scrabble had the right to terminate S & R's license if its sales fell below 50,000 units in any calendar year.

12. The business of the company was highly seasonal.

13. There was always the possibility and even likelihood that Scrabble and Parcheesi would become unpopular and not be saleable.

Defendant's proof offered to sustain the Commissioner's valuation of $1,000 per share is discussed below. It produced two experts who utilized the comparative appraisal method in the process of arriving at their ultimate opinions.

The first expert [6] is a financial analyst in the Internal Revenue Service. Educated both in business administration and the law, he worked, prior to becoming employed by the Internal Revenue Service, as a security analyst for stockbrokers (Bache & Co. and Hayden, Stone & Co.), as a branch office assistant manager for a company in the investment business (Hess & Co.), and as an investment counselor for Standard & Poor. In these capacities, he had made many evaluations of minority blocks of stocks of small, closely held corporations. He selected, as comparatives, four companies in the game and toy business whose stocks were publicly traded,[7] and arrived at ratios between their market prices as of April 24, 1961 and their earnings and book values. He found that, on the basis of their earnings for the most recent five full calendar years prior to the date of death (1956–1960), their market prices were 41 times earnings.

---

6. Mr. Leo Goulston.

7. Aurora Plastics, Mattel, Inc., Milton Bradley Company, and Remco Industries.

On the basis of 1960 earnings alone, the ratio was 29.55 times earnings. S & R's average earnings for the five-year 1956–1960 period were $89 per share. On the 41 times earnings basis of the four comparatives, S & R's per share price would be $3,649. S & R's 1960 per share earnings were $123.32. On the 29.55 times 1960 earnings basis of the four comparatives, S & R's per share price would be $3,644.11.

As to book values, the ratio of price to such values for the four comparatives averaged 5.76 to 1 as of December 31, 1960. S & R's book value as of such date was $899.81. On the sole basis of the average relationship that the book values of the common stocks of the comparatives bore to their market prices, S. & R's market price would be $5,182.91 a share.

The witness felt that these high ratios, producing in turn such high valuations when applied to S & R, might conceivably reflect unusual popularity of certain products of the comparatives at that particular time. To guard against such possibility, he took the lowest of the comparatives' ratios, instead of their averages. Of the four, the lowest price-earnings ratio was 21.70 to 1 on the five-year average basis. Multiplying this figure by S & R's $89 per share five-year average earnings gave a value, on such basis, of $1,931 per share. On a book value basis, again taking the lowest price-to-book value ratio (as of December 31, 1960) of 2.84, S & R's price per share would be $2,555.[8]

As a further check, the witness examined the general market prices as reflected in The Standard & Poor's Index of Industrial Stocks. This Index showed that publicly traded stocks were, as of April 24, 1961, selling at a price-earnings ratio of 23 to 1. Similarly, such stock prices were, as of December 31, 1960, approximately twice their book value. On such price-earnings ratio basis, the S & R stock would (on the basis of 1960 earnings of $123.32 per share) sell for $2,900 per share, and on such price-book value ratio basis, would sell for approximately $1,800 per share.

As a result of all these comparisons, the witness concluded that, were S & R stock similarly publicly traded as of April 24, 1961, it would have sold within a range of not less than $1,800–$2,000 a share.

The witness further concluded, however, that certain special considerations would warrant a substantial discount in such a price. Since the S & R stock was not publicly traded, it lacked marketability. Furthermore, the 337-share block being evaluated represented only a minority interest. Although the company had, during the five-year period, showed a favorable trend of steadily rising earnings,[9] it was somewhat vulnerable because it had only two principal products, indicating a lack of vitality and creativity in new product development; it was in a type of luxury business, and it was subject to lively competition from larger companies. Because of these factors, he felt a rather large discount of approximately 45–50 percent in the hypothetical $1,800–$2,000 selling price would in this case be warranted. On this basis, it was his opinion that $1,000 per share (as the Commissioner had determined) was the fair market value of the stock as of April 24, 1961. He felt this was a conservative price for the stock of such a successful, established company with in-

---

8. As to dividends, the average price to 1960 dividend ratio of the four comparatives was 109.5. The expert considered such a ratio as out of line and in this case eliminated such factor from his consideration.

9. As shown by the following table:

| Year | Per share Earnings |
|------|--------------------|
| 1956 | $44.15 |
| 1957 | 64.17 |
| 1958 | 103.51 |
| 1959 | 110.00 |
| 1960 | 123.32 |

creasing earnings and book values,[10] and with a principal product (Scrabble) which had attained such sustained popularity (in the industry it was considered that it had attained the status of a "staple" game).

The second expert,[11] a graduate of the Harvard Business School, worked as a security analyst and cost account manager for the Fidelity-Philadelphia Trust Company in Philadelphia, Pennsylvania. He is now president of an investment counseling firm in Washington, D. C.,[12] which furnishes advice on securities, including valuations of closely held corporations.

As comparatives, he selected three companies.[13] His studies indicated that, based on their average earnings per share for the five-year period 1956–1960, their stocks were selling, as of December 31, 1960, based on their average prices during such week, at an average of 19.3 times earnings. He further found that there was an exceedingly favorable investment climate for toy and game manufacturing companies during the early part of 1961, for between December 31, 1960 and April 24, 1961, the prices of the stocks of these three companies more than doubled. On the same five-year average price basis, the stocks of these same companies were selling, as of April 24, 1961 (based on their average prices during such week), at an average of 45.7 times earnings.

On these bases, S & R stock would have sold as of December 31, 1960, based on S & R's average earnings per share from 1956–1960 of $89 per share, at $1,718. On April 24, 1961, the stock would have sold at $4,067 per share.

On the same bases (average earnings per share during 1956–1960, and the average prices during the weeks of December 31, 1960 and April 24, 1961), Standard & Poor's Industrial Index showed a price-earnings ratio for the stocks included therein of 18.3 and 20.2 as of December 31, 1960, and April 24, 1961, respectively, indicating a much smaller rise during the early part of 1961 for stocks in general than for toy and game company stocks. On these bases, S & R stock would have sold as of December 31, 1960, and April 24, 1961, at $1,629 and $1,798, respectively.

The witness then used the same technique but with the average prices during the weeks of December 31, 1960 and April 24, 1961 applied only to the 1960 earnings per share of the three comparatives (instead of five-year averages), resulting in price-earnings ratios of 10.9 and 25.9, respectively (again reflecting the sharp rise in the stocks of the toy-game manufacturers during such four-month period). On this basis (S & R's 1960 earnings per share being, as hereinabove set forth, $123.32), S & R's stock would have sold for $1,344 as of December 31, 1960, and $3,194 as of April 24, 1961.

Applying the Standard & Poor Industrial Index test, also on the 1960 earnings basis, the witness found that the price-earnings ratio, calculated on the average prices for the week of December 31, 1960, was 18.2 (higher than the toy-game companies), and that the ratio calculated on the average prices for the week of April 24, 1961 was 20.2 (lower than the toy-game companies). On this basis, S & R's stock would have sold for $2,244 as of December 31, 1960, and $2,491 as of April 24, 1961.

The witness then gave special consideration to certain other facts relating to S & R and its operations. He found that, for the five full calendar years preceding the valuation date, sales had increased every year, going from over $1,-800,000 in 1956 to over $3,200,000 in 1960, an increase of 78 percent; that earnings per share had risen from over

---

10. The book value per share had increased every year for the prior ten years going from $136.77 in 1950 to $899.81 in 1960.

11. John W. Davidge.

12. Davidge, Van Cleef, Jordan & Wood, Inc.

13. Milton Bradley Company, Mattel, Inc., and Remco Industries.

$44 in 1956 to over $123 in 1960, an increase of 280 percent; and that the average dividend payout rate per share during such period was approximately 50 percent, a rate which he considered to be conservative and which an investor would reasonably feel would continue.[14] Although he took it into account, he did not consider the $899.81 per share book value as of December 31, 1960, to be a major factor in determining its fair market value. He gave primary weight to earning power. He also considered significant the fact that the company had good control over its costs, since costs had risen during the five-year period more slowly than sales and profits. He noted the strong liquid current asset position of the company, as shown by its balance sheet as of December 31, 1960, as well as the lack of any substantial indebtedness. He felt these were signs of good company management. He considered too that the block of stock being valued represented only a 17 percent minority interest. He also felt that recognition should be given to the fact that the comparatives left much to be desired since they manufactured toys (and some other products) as well as games, whereas S & R manufactured only games. He did feel, however, that an investor would consider that the companies fell within the same general category, although it would, of course, be more desirable if comparatives could be found which, like S & R, produced only games.[15] However, there were no such other companies whose stocks were publicly traded. Finally, he also considered the fact that S & R was simply a licensee with respect to the particular editions of Scrab-

ble which it was manufacturing and the owner of the copyright had reserved to itself the right to manufacture and sell the same editions for which it had licensed S & R, so that legally it could become a competitor of its licensee (the licensor also reserved the right to manufacture and sell certain higher-priced editions of the game, and did in fact do so).

Upon the basis of all the facts and figures he considered, the witness concluded that the fair market value of the S & R stock as of April 24, 1961, was $950. He recognized, however, that the valuation of any closely held security lacking a public market or a record of any significant private transactions or placements is difficult at best, and not a precise undertaking. He therefore felt that a certain flexibility was permissible, and that any valuation within the range of $900–$1,000 would not be unreasonable. He did not feel that any figure less than the lowest level of such range could be justified by rational analysis.[16]

Plaintiff attacks the valuation of such experts on various grounds. She says the companies they selected as comparatives are not truly comparable since they manufacture such items as toys and dolls, which appeal to a younger class of consumer than does Scrabble. She further argues that not enough consideration was given to certain unfavorable factors, such as (1) the company's being, as of the valuation date, in effect only a two-product business (Scrabble and Parcheesi), with over 60 percent of its sales in one product; (2) the company's relatively small size as compared

14. Milton Bradley's average dividend payout rate per share during 1956–1960 was 24 percent.

15. In this respect, Milton Bradley Company was the closest comparative, with approximately 70 percent of its sales in games.

16. Plaintiff contends that the second expert testified "he would not recommend that a willing buyer purchase the stock at $950.00," and that "such an admission emasculates his testimony." (Pltf. Brief at 41.) Plaintiff errs. The expert did not so testify. His testimony was only that he would not recommend such a stock to a "fiduciary" type of client, such as a church or college. He further testified, however, that he would recommend the stock at such figure to the appropriate type of investor, and that, as a matter of fact, he did have a client who he felt would be interested in purchasing such a block of S & R stock as was here involved.

with its closest competitor (the Milton Bradley Company); (3) the loss, during the six-month period preceding the valuation date, of its two top sales executives who had long been associated with the company; (4) the nonownership by the company of the Scrabble trademarks and copyrights and its position as only a licensee; (5) the legal ability of the licensor to enter into the business of manufacturing the same type of Scrabble games as S & R was licensed to manufacture; (6) the highly seasonal nature of its business, with a substantial part of its annual volume of sales being accounted for around the Christmas season, thus making it most vulnerable to strikes both within its unionized factory, and by such outside unions as those in the trucking and shipping industries, including the longshoremen;[17] and (7) considering the type of business it is in, its peculiar vulnerability to the public's fancy.[18]

■ We agree with the plaintiff that the companies used by the expert witnesses of defendant as comparables were not in fact truly comparable to S & R. Our trial judge found that there are no other publicly traded companies that are comparable to S & R in terms of game manufacture and that for this reason S & R was compared by such witnesses with other companies "which are essentially in the business of manufacturing toys." We do not think a company that manufactures toys or toys and games can be accurately compared to a company like S & R that manufactures only games. Their products appeal to and are used by different age groups. They are different in many other respects as shown herein. Therefore, since the basis for the opinions of defendant's expert

witnesses was grounded on the comparison of companies that were not truly comparable, their analyses based on the comparative appraisal method have but little, if any, weight in establishing the fair market value of the S & R stock. This court dealt with the principle of comparables in Jones Bros. Bakery, Inc. v. United States, 411 F.2d 1282, 188 Ct. Cl. 226 (1969). There the problem was whether or not the company had paid its officers more than reasonable salaries and deducted the same as an expense on their income tax returns. The government offered evidence of salaries of executives of another company that it contended was comparable to the plaintiff company to show plaintiffs' salaries were too high. The court held that while the two companies were similar in many respects, they were also quite different in other ways, and were not truly comparables. The court proceeded by a jury verdict on the whole record to fix proper salaries for plaintiff's officers that were lower than the amounts deducted by the plaintiff but higher than those contended for by the government.

In the case before us, the government relied on the testimony of its expert witnesses to establish the fair market value of the stock by the comparative appraisal method. Since the companies used by such witnesses for comparison were not true comparables, it becomes necessary for the court to review the whole record and consider all the evidence to arrive at the correct value of the stock.

We held in Penn Yan Agway Cooperative, Inc. v. United States, 417 F.2d 1372, 189 Ct.Cl. 434, (1969):

It is a well established rule of law, carefully analyzed and stated in Dry-

---

17. Most of the tiles, one of the components of the Scrabble game, are imported. S & R ships its products primarily by truck.

18. Plaintiff points to the upsurge in its 1954 and 1955 sales and profits after S & R first began marketing Scrabble, followed by the drastic drops therein in 1956, when Scrabble's initial flurry of popularity receded. From approximately $1,900,000 in 1953, sales jumped to over

$5,000,000 and $4,000,000 in 1954 and 1955, respectively. They then dropped to $1,800,000 in 1956. Similarly, gross profits went from $733,000 in 1953 to $2,300,-000 and $1,700,000 in 1954 and 1955, respectively, falling back to $710,000 in 1956. Plaintiff says the experts' going back only five years resulted in their failing to consider this particular period in S & R's life.

brough v. United States, 208 F.Supp. 279 (W.D. Ky. 1962), that *the market value of common stock* in a closely held corporation, there being no market sales of such stock, *must be determined upon consideration of all relevant factors*, such as earning capacity, anticipated profits, book value, and dividend yield. * * * [Emphasis supplied.] [*Id.* 417 F.2d at 1378, 189 Ct.Cl. at 446.]

We find a similar statement in Arc Realty Co. v. C. I. R., 295 F.2d 98 (8th Cir., 1961) as follows:

The question of "fair market value," defined to be "the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy nor to sell and both being informed," O'Malley v. Ames, 8 Cir., 197 F.2d 256, at page 257; Fitts' Estate v. Commissioner of Internal Revenue, 8 Cir., 237 F.2d 729, 731, is one of fact and cannot be established on the basis of fixed rules or formulae. Among the factors properly to be considered in making the determination are corporate assets, earnings, dividend policy, earning power of the corporation, prospects of the corporation, book value, character of the management, competition and other factors which an informed purchaser and informed seller would take into account. O'Malley v. Ames, supra; Fitts' Estate v. Commissioner of Internal Revenue, supra. [*Id.* at 103.]

■ The defendant contends that we should accept the evidence of its expert witnesses because they were experts in the field of market value analysis and were the only experts who testified. We are not required to do so. This was made clear by our decision in United States v. Northern Paiute Nation, 393 F. 2d 786, 800, 183 Ct.Cl. 321, 346 (1968) where we said:

The Indians' other complaint about the findings is that the Commission rejected its expert appraisers' views, and did not spell out why in detailed findings. In legal appraisement, however, widely divergent opinion testimony is the rule rather than the exception. The trier of fact must decide first, of course, if such testimony is competent and admissible. Before us, no party claims that this case was decided with respect to any issue on inadmissible testimony. The Indians wanted the Commission to take up the reasoning of its appraisers step by step, and either accept each step or show reasons for rejecting it. Having competent testimony before it, the Commission was not restricted to swallowing it whole or rejecting it utterly. It did not have to refute what it did not accept as controlling. It could, and apparently did, synthesize in its mind the immense record before it, determine to what extent opinion evidence rested on facts, consider and weigh it all, and come up with figures supported by all the evidence, perhaps, though not identified with any of it. * * *

In addition to the other circumstances favorable to the plaintiff's view in this case, as set forth above, there is the significant fact that the stock involved here was a minority interest of only 17 percent in a closely held corporation. It is logical to assume that this would adversely affect its value if it were offered for sale on the open market, as few people would be interested in buying it under these circumstances. The decided cases support this view. In Drybrough v. United States, 208 F.Supp. 279 (W.D. Ky., 1962), the court discounted by 35 percent the value of minority interests in a corporation. In that case the court cited with approval the decision in Whittemore v. Fitzpatrick, 127 F.Supp. 710 (D.C. Conn., 1954), where the court allowed a 50 percent discount for a minority interest in stock of a corporation, and stated further:

Other cases holding that minority stock interests in closed corporations are usually worth much less than the proportionate share of the assets to

which they attach are Andrew B. C. Dohrmann, (1930) 19 B.T.A. 507; Cravens v. Welch, (D.C. Cal., 1935) 10 F.Supp. 94; Estate of Irene DeGuebri-ant, (1950), 14 T.C. 611, reversed on other grounds Claflin v. Commission-er of Internal Revenue, 2 Cir., 186 F. 2d 307; Mathilde B. Hooper, (1940) 41 B.T.A. 114, 129; Bartram v. Gra-ham, (D.C. Conn., 1957) 157 F.Supp. 757; Bader v. United States, (D.C. Ill., 1959) 172 F.Supp. 833, and Snyder's Estate v. United States, (4 Cir., 1961) 285 F.2d 857. [208 F.Supp. at 287.]

The problem before us is always a difficult one. It is never possible to fix the value of corporate stock in a closely held corporation which is not sold on the open market with mathematical exact-ness, and we are not required to do so. This was aptly stated by the court in Arc Realty Co. v. C. I. R., *supra*, when it said:

> * * * The matter of fixing the fair market value of corporate stock for capital gains treatment, with nu-merous factors entering the picture, obviously cannot be accomplished with exactness or complete accuracy. * * * [295 F.2d at 103.]

Many times courts solve problems like the one before us by considering all the evidence and the whole record and then deciding what is right and just under all the facts and circumstances. We did this as to officers' salaries in Jones Bros. Bakery, Inc. v. United States, su-pra, and again in Meredith Broadcasting Co. v. United States, 405 F.2d 1214, 186 Ct.Cl. 1 (1968) in arriving at the val-ue of certain intangibles. We think we

are justified in following this procedure in the instant case. It appears to be fair and right and in accordance with justice to both parties that we do so.

Based on all the evidence and the whole record, we conclude that the fair mar-ket value of the 337 shares of S & R stock as of April 24, 1961, was $700 per share.

### THE CHARITABLE DEDUCTION ISSUE

For the purpose of computing such deduction, it is first necessary to arrive at a figure representing the amount that will go to charity at the termination of the trust. That was the way the executors computed it in the re-turn.[19] In view of the power given in the will to the trustees to sell the stock at 50 percent of book value as of the date of the decedent's death, the execu-tors properly used such figure in com-puting the amount that would go to charity, and the Commissioner was cor-rect in accepting such figure.

Indeed, in view of the controlling reg-ulations governing charitable bequests, it is necessary to give effect, as the ex-ecutors did, to the power vested in the trustees by the will. Section 20.2055–2(b) of the Treasury Regulations on Es-tate Tax (1954 Code) specifically pro-vides, with respect to charitable bequests, that if a "trustee is empowered to divert the property * * *, in whole or in part, to a use or purpose which would have rendered it, to the extent that it is subject to such power, not deductible had it been directly so bequeathed, devised,

---

19. The schedule in the return (Schedule N) in which the charitable deduction was computed contained the following state-ment and explanation:

"Decedent created a Trust of her residu-ary estate, to pay the income therefrom to her sisters—Harriet Righter, born 2/24/78, and Katharine Righter, born 9/23/79—for their lives and upon the death of the survivor directed that certain general legacies be paid from the remain-der, and the balance remaining after the

payments aforesaid to certain named charities. Said residuary trust is con-tained in Paragraph Sixteenth of dece-dent's Will, a copy of which is attached to this return.

"Factor used in determining the remain-der interest of said residuary trust was taken from the Actuarial Tables con-tained in the Commissioner's Regulations. Table III, Value of $1.00 due at death of Survivor of two persons."

or given by the decedent, *the deduction will be limited to that portion * * * of the property * * * which is exempt from an exercise of the power."* (Italics supplied.)[20] This provision directly controls the situation here involved, where the trustees were not only empowered, but were required, at the termination of the trust, to offer the S & R stock to its then officers at a price of 50 percent of book value as of the date of the decedent's death. Thus, no matter what the fair market value of the stock was as of such date, the charities would receive, in accordance with the exercise of the power vested in the trustees by the will, only 50 percent of book value as of the date of the decedent's death. In the words of the regulation, therefore, to the extent that the fair market value of the stock exceeded 50 percent of the book value as of the date of death, the will empowered the diversion of such excess to persons other than to charities. Only that portion of the value of the property exempt from such power to divert, *i. e.*, $424.90 per share, is accordingly deductible as a charitable bequest.

Plaintiff says that if the test is the "amount that would in fact go to charity" then defendant should at least "al-

low a charitable deduction of $473.40 with respect to the stock purchased [by Mr. Tobias and his wife in 1962] * * *."[21] Plaintiff herself supplies the answer to this contention, however, by also pointing out that it is "the situation at the instant of death" that controls.[22] Plaintiff elected to have the assets valued as of the date of the decedent's death, and for the purposes here involved, it is as of such date that the return, including the amount of the charitable deduction, speaks, and the tax computed. The deduction is based on the present (as of the date of death) value, actuarially computed, of the remainder interest, and that was the way the executors computed it in the return. Accordingly, for the purpose here in question, the subsequent sales to the Tobiases, to which both parties refer, are irrelevant. Merely looking to the will, the conclusion would have to be made that the trustees were empowered to sell the stock at the termination of the trust at 50 percent of book value as of the date of the decedent's death, and such sale proceeds would therefore fix the amount that would go to charity. Consequently, in accordance with the regulation, the charitable deduction is limited to such amount.[23] *Cf.* Commissioner of Internal

20. "§ *20.2055–2   Transfers not exclusively for charitable purposes.*

*   *   *   *   *

"(b) *Transfers subject to a condition or a power.* If, as of the date of decedent's death, a transfer for charitable purposes is dependent upon the performance of some act or the happening of a precedent event in order that it might become effective, no deduction is allowable unless the possibility that the charitable transfer will not become effective is so remote as to be negligible. If an estate or interest has passed to or is vested in charity at the time of a decedent's death and the estate or interest would be defeated by the performance of some act or the happening of some event, the occurrence of which appeared to have been highly improbable at the time of the decedent's death, the deduction is allowable. If the legatee, devisee, donee, or trustee is empowered

to divert the property or fund, in whole or in part, to a use or purpose which would have rendered it, to the extent that it is subject to such power, not deductible had it been directly so bequeathed, devised, or given by the decedent, the deduction will be limited to that portion, if any, of the property or fund which is exempt from an exercise of the power. * * *" [26 C.F.R. § 20.2055–2 (1969).]

21. Pltf. Reply Brief at 22.

22. *Id.* at 21.

23. The will spoke of a sale of the stock to the officers only in terms of 50 percent of book value at the date of decedent's death. The July 12, 1961 sale of 200 shares at $424.90 per share conformed to this formula. Plaintiff testified that, with respect to the July 12, 1961 transaction

Revenue v. Sternberger's Estate, 348 U. S. 187, 75 S.Ct. 229, 99 L.Ed. 246 (1954) (no part of a conditional bequest to charity allowed as a deduction from the gross estate where there was no assurance that charity would receive the bequest or a determinable part of it).

## SUMMARY

Since the deficiency which plaintiff paid was based upon a valuation of the S & R stock as of the date of death of $1,000 per share for gross estate tax purposes, and the determination herein is that such value was $700 per share, plaintiff is entitled to recover on such issue to such extent. Plaintiff is not entitled to recover on the issue of the charitable deduction.

Section 2053 of the Internal Revenue Code of 1954 allows a deduction from the value of the gross estate for "administrative expenses." Section 20.-2053–3(c) (2) of the Treasury Regulations provides that such expenses include "A deduction for attorneys' fees incurred in contesting an asserted deficiency * * *" and that "A deduction for reasonable attorney's fees actually paid in contesting an asserted deficiency * * * will be allowed even though the deduction, as such, was not claimed in the estate tax return or in the claim for refund." The regulation goes on to provide that "A deduction for these fees shall not be denied, and the sufficiency of a claim for refund shall not be questioned, solely by reason of the fact that the amount of the fees to be paid was not established at the time that the right

to the deduction was claimed." 26 C. F.R. § 20.2053–3(c) (2) (1969).

Pursuant to these provisions, plaintiff also claims such amount as may be allowable as a result of a deduction for reasonable fees and expenses incurred in connection with the prosecution of this case. Defendant concedes plaintiff's entitlement to such a deduction. No reason is apparent for not giving effect to the parties' agreement in this respect. Accordingly, the amount of the recovery should· also reflect such a deduction.

DAVIS, Judge (dissenting in part):

Although the court's opinion adopts much of Commissioner Gamer's underlying reasoning, it balks at his most significant intermediate conclusions and also at his ultimate determination that the stock was worth no less than $900 per share. I consider his opinion and conclusion correct, and I would follow him entirely.[1]

One of the two principal differences between the court and the trial commissioner concerns the evaluation of the stock by the Internal Revenue Service for the other estates. Commissioner Gamer thought, and I agree, that the valuations accepted for these other estates "contribute little of probative value in the solution of the problem involved in this case." He cited Fitts' Estate v. Commissioner of Internal Revenue, 237 F.2d 729, 733–734 (C.A. 8, 1956), in which the court ruled that the Tax Court did not abuse its discretion in excluding testimony concerning the valuation of unlisted, closely held stock

" * * * we [the executors] had the instructions of my sister Jessie's will"; that the executors concluded that " * * * that's all right with us, it is as near as we can guess to the probable value of it"; (Tr. at 15) and that the sale was made in accordance with the decedent's "directions" and "instructions." (Tr. at 20.) However, the April 5, 1962 sale of 137 shares did not so conform. This sale, at $473.40 per share, was made at 50 percent of book value as of the date of the sale instead of the date of death. (It is true that the July 12, 1961 sale would

conform to both standards.) Apparently the executors felt they could make the sale upon such terms and thus deviate from the terms of the will at least to such extent. At the trial, plaintiff's counsel referred to the sales as having been made "substantially" in accordance with the terms of the will. (Tr. at 6.)

1. There is now no dispute as to the charitable deduction issue, since plaintiff does not seek review of the trial commissioner's adverse holding on that point.

in another estate where "[t]here is no indication as to how the values [of the stocks in the other estates] were arrived at * * *."[2] After detailing the six instances of valuation of the instant stocks in other estates, the trial commissioner pointed out that:

"Thus, an analysis of the situation in each of the six estates upon which plaintiff relies so heavily fails to reveal in any of them what the considerations were that led to the acceptance by the Internal Revenue Service of the valuations indicated. In four of the six, there is no evidence that any investigation was initiated by the Service, the taxpayer's valuation merely being accepted as filed. And as to the first of the other two, in which, after a consideration of the company's financial statements for prior years, the valuation was raised from $275, as set forth in the return, to $450, there is nothing to indicate the basis for such $450 figure or why it was selected. The second simply used the figure of the first. The evidence concerning these other estates has little probative value in the solution of the factual problem here involved of determining the fair market value of the 337 shares of S & R stocks as of April 24, 1961.

The 'equality of treatment' principle applied to the excise tax problem involved in International Business Machines Corp. v. United States, 170 Ct. Cl. 357, 367, 343 F.2d 914, 920 (1965),[7]

7. "Equality of treatment is so dominant in our understanding of justice that discretion, where it is allowed a role, must pay the strictest heed.'

cert. denied, 382 U.S. 1028 [86 S.Ct. 647, 15 L.Ed.2d 540] (1966), which plaintiff emphasizes, has no applicability to the estate tax problem here involved. The court's concern in that case was the adverse competitive ef-

fects of the inconsistent positions of the Internal Revenue Service upon the operations of two similarly situated business competitors. The Commissioner there exercised a statutorily conferred discretion by denying an application for an excise tax exemption in one situation and granting it to a competitor identically situated. The court refused to sanction such discrimination between the two business concerns operating in the field. It construed the statute as directing the Commissioner to apply equality of excise tax treatment to competitors similarly situated. Obviously, such a situation is hardly applicable to the type of estate tax issue here involved which concerns only the factual problem of fair market value of a certain block of stock on a certain date. The Internal Revenue Manual merely provides that 'it may not be necessary to make another detailed analysis of the stock' in the situation where 'a valuation has been made in a prior estate * * * provided the valuation date on the prior estate is within reasonable proximity to the current date and the pertinent facts have not changed substantially.' Surely, such a discretionary authorization in limited situations neither constitutes a directive to the agents to accept at all times in the future a stock valuation made in a prior estate, nor does it give a taxpayer anything in the nature of a vested right to have the prior valuation applied to his return. As the court stated concerning the gift tax involved in Wagner v. United States, 181 Ct.Cl. 807, 817–818, 387 F. 2d 966, 972 (1967), with respect to a charge of alleged discrimination against the taxpayer:

'Nor did discrimination result from the circumstances that other persons * * * may have never

2. The Eighth Circuit also said: "* * * the valuation of the stock in the case of one taxpayer would be no 'binding adjudication of its value in the case of another taxpayer, and such evidence

would be of little probative value in the absence of a showing that the valuation was arrived at after a thorough investigation."

paid a gift tax ·* * *. * * * The fact that all taxpayers or all areas of the tax law cannot be dealt with by the Internal Revenue Service with equal vigor and that there thus may be some taxpayers who avoid paying the tax cannot serve to release all other taxpayers from their obligation. As this court said in Kehaya v. United States, 174 Ct. Cl. 74, 78, 355 F.2d 639, 641 (1966): "The Commissioner's failure to assess deficiencies against some taxpayers who owe additional tax does not preclude him from assessing deficiencies against other taxpayers who admittedly owe additional taxes on the same type of income. The Commissioner might reasonably conclude that a reaudit of * * * returns * * * would not produce sufficient additional revenue to justify the undertaking. Such a decision would certainly not be arbitrary." ' "

The other major disagreement between court and trial commissioner hinges on the treatment of the evidence given by the Government's experts. Plaintiff presented no expert evidence at all, and in the commissioner's eyes (as in mine) the material on which plaintiff does rely (the sale to Mr. Tobias, the other valuations by IRS, the testimony of Miss Righter and Mr. Tobias, the statement in the will) is all "unacceptable" as proving value. On the other hand, as the commissioner says, the "evidence of fair market value presented by defendant [through its expert witnesses] is based upon a sound approach and is, from a financial analysis viewpoint, entirely reasonable." As a result, he properly considered that he was justified in placing his ultimate conclusion as to the fair market value of the S & R stock (as of April 24, 1961) "within the confines of the opinions of defendant's experts."

The trial commissioner did not neglect the "unfavorable" factors which both the plaintiff and the court stress. He said:

"Some of these factors were, however, given ample consideration in the very large discounts from the market values indicated by the application of the comparative appraisal method which the experts took in arriving at their final conclusions. Others, such as the vulnerability to strikes, were not considered to be any more serious than generally applicable to manufacturing businesses. The loss of experienced sales personnel affected in no way the continually increasing sales under a new Sales Manager (appointed in 1959) who had substantial and successful experience with the company, first as a salesman and then as Assistant Sales Manager. And the long, apparently satisfactory association S & R had with its licensor, the manufacturing capacity and experience which S & R had and which the licensor did not, and the substantial royalties the licensor was receiving, would hardly lead an investor to believe that the licensor would soon decide to invest in greatly increased manufacturing facilities and go into direct competition with its licensee.

In view of the steadily increasing trend of the company's earnings during the five-year 1956–1960 period preceding the valuation date, the company's ability to establish Scrabble as a staple game in the industry, its steady growth in assets, its plant enlargement program initiated in 1960 and still in process as of the valuation date, indicating confidence by the management in the company's future, its efficient management, as demonstrated by its ability to produce good profit margins and effect good cost controls, and the particularly favorable investment climate at the date of valuation, both for stocks in general and for stocks in the game and toy industry in particular, it is concluded that the fair market value of the 337 shares of S & R stock as of April 24, 1961, was $900 per share. This is at the lowest end of the range testified to by defendant's experts. Such a

valuation reflects an extremely conservative price-earnings ratio of 7.3 to 1, and a generous (as of such date) dividend yield, based on 1960 dividends, of 5.5 percent.[21] Such value

21. As against the then 3.4 percent yield on the stocks composing the Dow-Jones industrial average.

would simply be approximately equal to the December 31, 1960 book value of $899.81. Based on this record, no lower valuation would appear to be warranted." [22]

22. Plaintiff's proposed valuation of $424.-90 would, based on the 1960 earnings of $123.32 per share, result in a price-earnings ratio of only 3.5 to 1 (at a time when such ratio of the four comparatives used by Mr. Goulston averaged 29.55 times earnings and the stocks in Standard & Poor's Industrial Index averaged 23 times earnings) ; a dividend return, based on 1960 dividends of $50 per share, of 11.3 percent (at a time when the Dow-Jones industrial stock average was 3.4 percent) ; and in a book value of one-half (as against the comparatives, whose prices averaged 5.76 times book value, and the stocks in Standard & Poor's Industrial Index, whose prices, as of the end of 1960, averaged around twice book value).

In rendering a "jury verdict" of $700 per share, the court seems to me to have no sound basis at all for its finding since there is no evidence whatever pointing to any figure in that range, and the amount of $700 is not, as in some cases, within the span of conflicting expert testimony. I do not know how the court arrived at it, and the opinion does not explain. Cf. United States v. Nez Perce Tribe of Indians, Appeal No. 2–70, decided this day. For myself, rejecting as I do plaintiff's evidence as wholly unpersuasive, I must agree with Commissioner Gamer that our choice has to be within the range of values testified to by the Government's experts.[3] There is

3. Defendant errs in saying that one must accept the $1,000 figure (which the IRS used) once one concludes that plaintiff has failed to prove any lower figure. By putting in its own affirmative evidence of value, the defendant opens the way for

no adequate reason, in my view, to reject the views of these two qualified witnesses, one of whom was not connected with the Government and had had great experience in valuations of this type, especially since the trial commissioner heard and credited them.

LARAMORE and DURFEE, JJ., join in the foregoing opinion dissenting in part.

the trier to take account of that evidence in coming to a final conclusion. Here, defendant's own evidence leads one to infer that $900 (rather than $1,000) is the better figure.